## Mack Appeal.

252

Argued January 13, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Charles E. Kenworthy*, with him *Walter T. McGough* and *Reed, Smith, Shaw & McClay*, for appellants.

*Fred B. Trescher, J. J. Snyder, Jr., Vincent R. Smith*, and *Kunkle and Trescher*, for appellants.

*Paul K. McCormick*, with him *H. Reginald Belden*, for appellees.

OPINION BY MR. JUSTICE ARNOLD, October 5, 1956:

The seven defendants severally appeal from judgment and sentence by the court below finding each of them guilty of contempt, and imposing upon each a fine and five days imprisonment in the county jail. The appeals were argued together and will be disposed of in one opinion.

The respective judgments and sentences were sustained by the court below upon findings that defendants violated Westmoreland County rule of court No. 6084. The rule provides:

"(a) No pictures or photographs shall be taken, immediately preceding or during sessions of this court or recesses between sessions, in any of the court rooms

or at any place in the court house within forty feet of the entrance to any court room.

"(b) No court proceeding shall be broadcast or televised.

"(c) No pictures or photographs of any party to a civil or criminal action, juror or witness, shall be taken in the Law Library or in any office or other room of the court house, except with the knowledge and consent of the person or persons photographed.

"(d) No prisoner or inmate of the county jail shall be photographed in the jail or on his way to or from a session of court."[1]

As set forth in the facts hereunder, we are concerned only with subsections (a) and (d) of the rule, and our decision will be limited to these.

By a verdict of the jury J. Wesley Wable, known as the "Turnpike Killer," had been found guilty of first degree murder with a recommendation of the death penalty. On December 28, 1954, he had been called for sentence by Judge BAUER of the court below, in court room No. 5 on the fourth floor of the court house. This was a matter of common knowledge to the defendants.

The fourth floor consists of an octagonal shaped court room, flanked by the judge's chambers and a 50 foot corridor. The corridor is reached by means of a public elevator and a stairway. Entrance to the court room is from the corridor. Near this court room door the defendants surreptitiously took photographs of Wable and deputy sheriffs as he was being escorted to the court room. Wable, who was manacled to the sheriff, had been conveyed from the county jail to the first floor of the court house, and thence by elevator to the fourth floor. While he and the officers were approach-

---

[1] Many federal courts have adopted similar regulations. See Vol. 37, Journal of the American Judicature Society, February 1955.

ing the entrance to the court room, and within 40 feet thereof, the defendants, by prearrangement each with the others, took the photographs in question.[2] These were procured without Wable's or the court's consent or knowledge. In fact, the attention of the sheriff and his deputies was distracted by a decoy photographer. The photographs were taken by means of infra red rays not requiring the use of flash bulbs and causing no commotion or noise. The following day these photographs were published by the defendants.

The defendants admit that they committed all of the acts hereinbefore described, and also that these acts were performed by agreement among them. Their plea is in the nature of "confession and avoidance."

The first contention is that the rule of court is in conflict with the federal and state constitutions involving the right of free press. However, as pointed out by Erwin D. Canham, Editor of the Christian Science Monitor, "freedom of the press is not a right of the press. It is a right of the people."[3] By the instant rule the court was attempting to preserve the dignity of the court and the decorum of trial, thereby insuring the orderly administration of justice. To be valid, such rule must be reasonable. Thus in *American Communications Assn., C.I.O. v. Douds*, 339 U.S. 382, 399, it was held: "When particular conduct is regulated in the interest of public order, and the regulation results

---

Among these are Colorado, Rule 11; District of Columbia, Rule 95, which is very similar to the Westmoreland County rule; New Mexico, Minnesota, Oklahoma (northern, eastern and western districts) ; Wisconsin, which is substantially similar to the District of Columbia; Kansas; and North Dakota.

[2] One photograph was also taken on the first floor, after sentence had been imposed upon defendant.

[3] See article in Mid-Century, The Social Implications of Scientific Progress, John Ely Burchard, editor, New York and Cambridge, Mass.: Technology Press of M. I. T., 1950, p. 261.

in an indirect, conditional, partial abridgement of [freedom of the press] . . ., the duty of the courts is to determine which of these two conflicting interests demands the greater protection under the particular circumstances presented." In *Fitzgerald v. Philadelphia*, 376 Pa. 379, 387, 102 A. 2d 887, this Court held: " 'Of course, it is accepted constitutional doctrine that these fundamental human rights are not absolute . . . The essential rights of the First Amendment in some instances are subject to the elemental need for order without which the guarantees of civil rights to others would be a mockery.' "

Therefore, whether or not freedom of the press is here involved is immaterial, since such freedom is subject to reasonable rules seeking maintenance of the court's dignity and the orderly administration of justice.

The defendants repeatedly assert that they do not contend for the right to take pictures within the court room, even by the infra red ray method which is accompanied by no display or disorder. But it must be conceded that if we sustain their contention that this rule of court infringes upon their rights of freedom of the press, the court likewise would have no power to forbid the taking of pictures in the court room which were accompanied by no disorder or disturbance. Yet this Court has adopted Rule 223 of the Pennsylvania Rules of Civil Procedure, which has the effect of a statute,[4] and which provides: "During the trial of actions the court shall prohibit the taking of photographs and motion pictures in the court room and the transmission of communications by telegraph, telephone, or radio in or from the court room." In addition, Canon

---

[4] Act of June 21, 1937, P. L. 1982, as amended by Act of March 30, 1939, P. L. 14, 17 PS §61-65.

35 of the American Bar Association reads as follows: "Proceedings in court should be conducted with fitting dignity and decorum. The taking of photographs in the court room, during sessions of the court or recesses between sessions, and the broadcasting or televising of court proceedings are calculated to detract from the essential dignity of the proceedings, . . . degrade the court, and create misconceptions with respect thereto in the mind of the public and should not be permitted."[5]

The Westmoreland County rule incorporates the provisions of Pa. R. C. P. 223 (b), and then proceeds to state further restrictions and limitations by it deemed proper and necessary to preserve the dignity of the court and the decorum of trial. The taking of a picture of a person called for sentence certainly does not inform the public as to any material facts, and serves no purpose except to pander to the lower tastes of some individuals. Court rooms and court houses are not places of entertainment, and trials are not had for the purpose of satisfying any sadistic instinct of the public seeking sensationalism.

The fact that the contempt in this case did not occur in the court room, but in the precincts of the court, does not make the rule unreasonable. ". . . the Court, at least when in session, is present in every part of the place set apart for its own use, and for the use of its

---

[5] This Canon has been approved by state courts and state bar associations.

The Federal Rules of Criminal Procedure promulgated by the Supreme Court of the United States, provide: "The taking of photographs in the court room during the progress of judicial proceedings . . . shall not be permitted by the court." This rule is binding upon all federal courts. We can find no reason or basis for declaring such rules unconstitutional, and are unwilling to sanction the taking of pictures within the court room. Nor can we find that the extension of the prohibition to a limited area outside the court room is an abuse of the court's discretion.

officers, jurors and witnesses; and misbehavior any-where in such place is misbehavior in the presence of the court": *Ex Parte Savin,* 131 U.S. 280. As stated in *Ex parte Sturm,* 136 A. 312 (Md) : "It is essential to the integrity and independence of judicial tribunals that they shall have the power to enforce their own judgment as to what conduct is incompatible with the proper and orderly course of their procedure." The Westmoreland County rule is proper so long as it bears a reasonable relation to the aim sought: maintenance of the dignity of the court and the orderly administra-tion of justice. Certainly in this case the area affected is reasonable, as are the limitations of action, and the rule prohibiting the taking of pictures within the stated limits is well within the power of the court. See also *Robinson v. City Court for City of Ogden,* 185 P. 2d 256 (Utah) ; *People v. Ulrich,* 34 N.E. 2d 393 (Ill.)

Amicus Curiae cites the case of *People v. Jelke,* 308 N.Y. 56, 123 N.E. 2d 769, in which conviction was re-versed where the public and representatives of the press were excluded from the court room during the taking of testimony. But the court stated that the rea-son for the reversal in that case was that such exclu-sion deprived the defendant of an impartial and *public* trial. That case has no bearing on the instant case. Here the defendants were freely entitled to enter the court room and its precincts, and the press was accord-ed full coverage. Moreover, in an opinion written by the same judge who wrote the opinion in the cited case, the New York Court of Appeals denied the right of the Press Associations and Newspaper Publishers to be present at the trial of Jelke, and to report the proceed-ings, and further the court held: ". . . this is not a case of . . . freedom of the press . . . and . . . the right as-serted by petitioners is not embraced within the con-stitutional provision guaranteeing those freedoms . . .

But freedom of the press is in no way abridged by an exclusionary ruling which denies newspapermen the opportunity to 'see and hear what transpired.' . . . The fact that petitioners are in the business of disseminating news gives them no special right or privilege, not possessed by other members of the public . . ."[6] See also *State of Ohio v. Clifford,* 162 Ohio 370, 123 N.E. 2d 8, certiorari denied, 349 U. S. 929.

The defendants also violated the rules of court of Westmoreland County, which were made to insure the right of privacy of the defendant. There can be no question that American jurisprudence recognizes the right of privacy; the only question being its limits. See "The Right to Privacy," by Samuel D. Warren and Louis D. Brandeis, 4 Harvard Law Review, 193. As stated in 77 C.J.S., Right of Privacy, at page 397, in some, but not in all jurisdictions the existence of such right has been recognized, even in the absence of statutory regulation. In this jurisdiction we find no basis for denying the existence of such right or its enforceability. See the excellent opinion of Judge ALESSANDRONI in *Clayman v. Bernstein,* 38 D. & C. 543, and cf. *Harlow v. Buno Co., Inc.,* 36 D. & C. 101. See also *Waring v. WDAS Broadcasting Station, Inc.,* 327 Pa. 433, 194 A. 631, and particularly the concurring opinion of Justice MAXEY appearing at page 456; and Restatement, Torts, §867.

The court below, as are all courts, was charged with a duty to protect the right of privacy of the prisoner. It cannot be doubted that the prisoner was powerless to do so by any means within his control; and in such case the court has an inherent duty to use all reasonable means to safeguard that right. It is true that, in

---

[6] *United Press Associations v. Valente (Judge),* 308 N.Y. 71, 123 N.E. 2d 777.

a sense, the prisoner has been set apart from the general public and has become a "public figure." Yet he is the involuntary subject of court restraint and entitled to the safeguard of his individual right of privacy, just as the court is charged with securing to him his right of a fair trial and other rights too numerous to mention. In this case the defendant was found guilty of murder in the first degree by verdict of the jury, but at the same time he was a ward of the court who must be protected against the invasion of his rights by the press as well as the public. All reasonable rules looking to the establishment of such safeguards must be sustained. It needs no citation of cases to prove that many innocent persons have been found guilty and sentenced upon criminal charges, and later released when their freedom from guilt has been established. See *Commonwealth v. Zampogna*, 81 Pa. Superior Ct. 74, and *Commonwealth v. Fideli*, 81 Pa. Superior Ct. 79.

The able opinion of President Judge RICHARD D. LAIRD, writing for the court below, amply justifies the sustaining of these judgments. However, since these are "test" cases, we prefer to modify the sentences by striking therefrom the provision for imprisonment, leaving the sentence intact as to the imposition of fine and costs.

With the determination that the rules, so far as involved here, are reasonable, and not an abuse of the court's discretion, the judgment and sentences, as so modified, are affirmed.

———

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE BELL:

While I agree with the Court's decision prohibiting photographing a prisoner at the entrance of the Court-

room, I wish to record my emphatic opposition to photographing (with or without infra red rays) or televising or broadcasting Court proceedings. This question may not have been specifically argued in this case, but it was argued by the Press in an unreported companion case. Moreover, as Justice ARNOLD so aptly says, if the present contention of defendants is sustained the Court would have no power to forbid the taking of pictures in the Courtroom.

Freedom of the press—the right to freely publish and fearlessly criticize—was a plant of slow growth. It did not spring full-grown as Minerva did from the brow of Jupiter, nor rise as quickly as did the warriors when Cadmus sowed the dragon's teeth. It was planted by many hardy, freedom-loving souls and nurtured by public opinion for several centuries before it grew to be a tree of gigantic stature. Government both in England and the United States constantly tried to suppress or destroy it. Freedom of the press became a recognized inherent Right only after and as a result of the famous Zenger libel case in New York City in 1735. In that case Zenger's lawyer, Andrew Hamilton of Philadelphia,* argued vigorously for the right of a newspaper to criticize freely and truthfully the acts and conduct of governmental officials. The Court refused to recognize the theory of freedom of the press, or permit Hamilton to prove "Truth" as a defense; nevertheless the jury, ignoring the charge of the Court, acquitted Zenger. Public opinion rallied to the cause which Hamilton pleaded and freedom of the press gradually became recognized as an inalienable Right which

---

* The origin of the phrase "Smart as a Philadelphia lawyer", denoting the top of the legal profession, is attributed to Andrew Hamilton's brilliant defense of Zenger. See "Ordeal of the Press" by Ralph O. Busser, Esquire, published by the University of Pennsylvania in The General Magazine, Winter 1954.

was ordained and affirmed in the Constitution of the United States and in the Constitution of Pennsylvania.

However, it is an often overlooked truism that neither freedom of speech nor freedom of the press, nor freedom of religion, which together constitute our Country's great bulwark of freedom, is absolute and unlimited: *Poulos v. New Hampshire*, 345 U. S. 395; *Beauharnais v. Illinois*, 343 U. S. 250; *Garner v. Los Angeles Board*, 341 U. S. 716; *Dennis v. United States*, 341 U. S. 94; *American Communications Assn. v. Douds*, 339 U. S. 382; *Kovacs v. Cooper*, 336 U. S. 77; *United Public Workers of America v. Mitchell*, 330 U. S. 75; *Whitney v. California*, 274 U. S. 357; *Gitlow v. New York*, 268 U. S. 652; *Gilbert v. Minnesota*, 254 U. S. 325; *Schenck v. United States*, 249 U. S. 47; *Frohwerk v. United States*, 249 U. S. 204; *Debs v. United States*, 249 U. S. 211; *Abrams v. United States*, 250 U. S. 616; *Pierce v. United States*, 252 U. S. 239; *Schaefer v. United States*, 251 U. S. 466; *Fitzgerald v. Philadelphia*, 376 Pa. 379, 102 A. 2d 887; *Wortex Mills, Inc. v. Textile Workers Union*, 369 Pa. 359, 363, 85 A. 2d 851; *Commonwealth v. Geuss*, 168 Pa. Superior Ct. 22, 76 A. 2d 500, 368 Pa. 290, 81 A. 2d 553; *State of Ohio v. Clifford*, 123 N.E. 2d 8. See also: Rule 223 (b), Pennsylvania Rules of Civil Procedure; Canon 35, Canons of Judicial Ethics, American Bar Association.

In *United Public Workers of America v. Mitchell*, 330 U. S., supra, the Court said (page 95) : "Of course, it is accepted constitutional doctrine that these fundamental human rights are not absolutes. . . . The essential rights of the First Amendment in some instances are subject to the elemental need for order without which the guarantees of civil rights to others would be a mockery."

In *American Communications Assn. v. Douds,* 339
U. S., supra, the Court said (page 394) : "Although the
First Amendment provides that Congress shall make
no law abridging the freedom of speech, press or as-
sembly, it has long been established that those free-
doms themselves are dependent upon the power of con-
stitutional government to survive. . . . Freedom of
speech thus does not comprehend the right to speak on
any subject at any time. . . . the right of the public to
be protected from evils of conduct, even though First
Amendment rights of persons or groups are thereby in
some manner infringed, has received frequent and con-
sistent recognition by this Court. [Citing cases.] . . .
We have never held that such freedoms are absolute.
The reason is plain. As Mr. Chief Justice HUGHES put
it, 'Civil liberties, as guaranteed by the Constitution,
imply the existence of an organized society maintain-
ing public order without which liberty itself would be
lost in the excesses of unrestrained abuses.' Cox. v.
New Hampshire, supra [312 U. S. 569] at 574."

In *Gitlow v. New York,* 268 U. S., supra, the Court
said (page 666) : "It is a fundamental principle, long
established, that the freedom of speech and of the press
which is secured by the Constitution, does not confer
an absolute right to speak or publish, without responsi-
bility, whatever one may choose, or an unrestricted and
unbridled license that gives immunity for every possi-
ble use of language and prevents the punishment of
those who abuse this freedom. 2 Story on the Consti-
tution, 5th ed., §1580, p. 634; Robertson v. Baldwin,
165 U. S. 275, 281; Patterson v. Colorado, 205 U. S.
454, 462; Fox v. Washington, 236 U. S. 273, 276;
Schenck v. United States, 249 U. S. 47, 52; Frohwerk
v. United States, 249 U. S. 204, 206; Debs v. United
States, 249 U. S. 211, 213; Schaefer v. United States,
251 U. S. 466, 474; Gilbert v. Minnesota, 254 U. S. 325,

332; Warren v. United States, (C.C.A.) 183 Fed. 718, 721. Reasonably limited, it was said by Story in the passage cited, this freedom is an inestimable privilege in a free government; without such limitation, it might become the scourge of the republic."

In *Wortex Mills, Inc. v. Textile Workers Union*, 369 Pa., supra, this Court said (page 363) : "Freedom of speech is not absolute or unlimited—for example, a man may not slander or libel another; he may not publicly blaspheme the Deity; he may not engage in loud speaking through sound trucks during certain hours or in certain parts of a city; and he may not assemble with others to commit a breach of the peace or to incite to riot or to advocate the commission of crimes. Freedom of speech gives no right of intimidation or coercion and no right to damage or injure another's business or property, . . . ."

To hold that Freedom of Speech or of the Press is absolute and unlimited would produce ridiculous situations and often result in disorder, confusion or Judicial or governmental paralysis. For example, under the *absolute* freedom theory, persons could talk lewdly or loudly or all at once, or even shout "Fire" in a Courtroom; every press representative and every freedom-loving citizen in the Courtroom could, during the trial, take noiseless photographs of Judge, jury, defendant and all persons connected with or witnessing the trial. Having one's picture taken, especially if it is likely to appear in the papers, possesses a fatal fascination for many persons. Under such theory and practice, the attention of the Judge, stenographer and witnesses would be diverted and distracted, every trial which had aroused a large public interest would degenerate into a circus side show, respect of the people for Law, Order and the Courts would diminish immensely, and many trials would become a travesty of Justice.

Furthermore, while gathering of the news is an indispensable part of the privately owned newspaper business, it is important to point out that freedom of the press does not give a constitutionally protected right to gather news: *United Press Associations v. Valente* (Court of Appeals of New York), 123 N.E. 2d 777, 778. Sober reflection will refute any contrary view. For example, the Constitution does not require persons interviewed by the press to submit to interrogation or to answer questions or furnish data or information. Freedom of the press means a constitutionally protected right to publish news without censorship, but even that right is, as we have seen, neither absolute nor unlimited.

Appellants have not only overlooked the authorities hereinabove cited and quoted, but have likewise overlooked a very important analogous authority which cuts out from under them the ground upon which they build their basic contention of absolute Freedom of the Press. The Supreme Court of the United States has promulgated the following Rule of Court, viz., Rule 53 of the Federal Rules of Criminal Procedure, Title 18, U.S.C.A.: "The taking of photographs in the court room during the progress of judicial proceedings or radio broadcasting of judicial proceedings from the court room shall not be permitted by the court."

If the taking of photographs of Court proceedings was privileged by the First Amendment—"Congress shall make no law . . . abridging the freedom of speech, or of the press . . ."—it is unthinkable that the Supreme Court of the United States would have adopted or would maintain its above quoted Rule of Court.

In the light of these reasons and authorities, it is manifest that a Court has the power, *and in the interest and for the preservation of Justice and the orderly administration of law,* should prohibit (1) the taking

of photographs (as well as the broadcasting and tele-
vizing) of Court proceedings, and (2) the photograph-
ing of all persons connected therewith, in Courtrooms
and, if necessary or advisable, within a reasonable dis-
tance from the entrances thereto. What is a reason-
able distance will, in each case, depend upon the facts.
However, the Court's power does not extend to other
rooms or offices which are in the same building and
are occupied by public or non-judicial officials, even
though the entire building is called a Court House.

To summarize: It is clear that Rule of Court No.
6084 (a) and (b) adopted by the Courts of Westmore-
land County, is valid and constitutional.

However, I do not agree with the majority's opin-
ion on the subject of privacy, nor its prohibiting the
taking of pictures of a prisoner who, while in custody,
is on his way to or from the Court but not near the
Courtroom. It seems to me that a person's right of
privacy is limited and in some instances lost when he
is charged with or convicted of crime. In such a case
he becomes a public figure who, with certain limita-
tions, as for example when he is in the Courtroom or
in the County jail, is subject to being photographed in
a public place, on a proper occasion and for a proper
purpose. I believe that in such a case, the public in-
terest is (subject as aforesaid) paramount to the pri-
vate right or interest. Pictures have become a color-
ful and important part of a newspaper. Taking photo-
graphs of a public figure, like gathering public news,
while not within the protection of the First Amend-
ment, is an important right which should not be un-
reasonably shackled or restrained. Cf. *Craig v. Har-
ney,* 331 U. S. 367; *Pennekamp v. Florida,* 328 U. S.
331; *Bridges v. California,* 314 U. S. 252. See also,
Concurring Opinion of Justice FRANKFURTER in *Den-
nis v. United States,* 341 U. S. 529-553.

The language of the Supreme Court of Massachusetts in *Themo v. New England Newspaper Publishing Co.*, 306 Mass. 54, 58, is particularly applicable to the case of the appellant who was convicted of taking a picture of Wable on the *first* floor of the Courthouse: "The present cases do not require us to decide whether any right of privacy is recognized by the law of this Commonwealth. If any exists, it does not protect one from having his name or his likeness appear in a newspaper when there is legitimate public interest in his existence, his experiences, his words, or his acts."

I would hold (1) that that part of Rule 6084 (d) which prohibits the photographing of a prisoner or inmate of the County Jail on his way to or from a session of the Court, but not at the entrance to the Courtroom (in this case three floors away), is invalid; and (2) the conviction of one of these appellants thereunder should be reversed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

### I.

The seven defendants in this case were found guilty of contempt of court in Westmoreland County because of the alleged violation of a Rule of Court (No. 6084) which prohibited, inter alia, the photographing of any prisoner on his way to or from a session of court, or of any person in any room of the courthouse without the knowledge and consent of the person photographed, or the taking of photographs in any place within 40 feet of the entrance to any courtroom. The seven defendants are William Block, publisher of the Pittsburgh Post-Gazette; Andrew Bernhard, editor of the Pittsburgh Post-Gazette; David W. Mack, publisher of the Greensburg Daily Tribune and Morning Review;

Vince Johnson, staff writer of the Pittsburgh Post-Gazette; Robert Purdy, free-lance Pittsburgh cameraman, and Don Bindyke and James G. Klingensmith, Pittsburgh Post-Gazette photographers.

On December 28, 1954, the defendants participated in a photographic operation which resulted in the taking of several pictures of John Wesley Wable, convicted murderer, while he was on his way to and from a courtroom in the Westmoreland County courthouse. It was the belief of William Block, Andrew Bernhard, and David W. Mack, as publishers and editors of responsible newspapers, that they owed a duty to the public to supply pictures of Wable who, because of his menace to public safety, had become a figure of general interest and concern. They also believed that the Westmoreland County Rule of Court No. 6084 violated the Freedom of Speech guaranty in the Constitution and that, therefore, they were acting within the framework of the organic law of the land when they directed their cameramen to photograph Wable. They did not, however, personally participate in any way in the actual photographic episode.

Every scrupulous effort was exerted by Messrs. Block, Bernhard, and Mack, together with the photographers themselves (and in this they were signally successful) to have the desired photography accomplished in a manner which in no way disturbed the tranquility, the orderly procedure, and the dignity of the Court. In fact, no cameras were introduced into the courtroom at any time, nor were pictures taken anywhere in the courthouse while the Court was in session. Furthermore, the cameras employed to take the few pictures involved were so small and were operated so unobtrusively, silently, and inconspicuously that no one, with the exception of the photographers themselves, were even aware that camera shutters had been clicked.

Despite the solicitous and painstaking care with which the cameras were handled so as not to stir the slightest ripple in the atmospheric calm of the courthouse, the Westmoreland County Court adjudicated the defendants guilty of direct criminal contempt and sentenced William Block, Andrew Bernhard, and David W. Mack to pay the costs of prosecution, plus a fine of $500 each, and to be committed to the county jail for a period of 5 days. Reporter Vince Johnson and photographers Robert Purdy, Don Bindyke, and James G. Klingensmith were sentenced to pay costs of prosecution, a fine of $100 each, and to be committed to the county jail for a period of 5 days.

The defendants appealed to this Court, and the majority of this Court has now affirmed the conviction. In doing so, it has struck a stinging blow against Freedom of the Press. Article I, Section 7 of the Pennsylvania Constitution provides: "The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature *or any branch of government,* and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty."*

The courts, of course, are a branch of government. Article I, Section 11 of the Pennsylvania Constitution declares: "All courts shall be open". This means that the courts shall be open not only to the public but also to those who represent the public. Obviously the entire population of Westmoreland County can never enter the courthouse on any given day to witness a certain trial, but the Aladdin's lamp of the newspaper provides

---

* Italics throughout, mine.

the phenomenon of vicarious attendance, and the magic carpet of a photograph takes the reader to and into a courthouse as easily as it transports him across the sea.

The Majority Opinion, quoting Ervin D. Cahnam, Editor of the Christian Science Monitor, says that "Freedom of the press is not a right of the press. It is a right of the people." Despite the eminence of the journal quoted, the statement is the opinion of but one individual and besides, it is an opinion which, while seeming to proclaim a great truth, succeeds only in executing an exercise in verbal gymnastics. It must be obvious to any high school student that when the press contends for its freedom, it necessarily battles for the right of the people to have a free press. When a lawyer lifts his voice in behalf of the constitutional rights of his client he is not pleading for his own personal prerogatives: he is presenting the claims of the person for whom he speaks. When a newspaper, through its representative, seeks admittance to legislative halls and courtrooms it asserts that right in the interests of the people. Thus, to say that freedom of the press is not the right of the press but of the people, is as trite as saying that the right of a senator to speak in the senate is not his own right but the right of the people who have elected him and whom he represents. Freedom of the press is the right of the people to be informed through the press and other media of communication.

That we should have to argue at this high hour in the day of civilization in behalf of the rights of the press to speak and act unrestrictedly in obtaining and reporting news is astonishing. After all the decisions which have been rendered, the books which have been written, the crusades which have been waged, the sermons which have been preached, and the lectures which have been delivered on freedom of the press; after witnessing every

day, almost every hour, that freedom of the press is a living, breathing thing, constantly blossoming on the tree of tangible demonstration, it seems like defending the North Star to descant at length on the need of a free press in a free democracy. And yet, it appears that from time to time the most obvious truism is attacked and the most commonplace virtue is derided, and, as a consequence, one finds oneself defending the integrity of the multiplication table, the sanctity of mother's love, and the need of milk for growing children.

Who can or should question that a free press is the very foundation of Anglo-Saxon democratic institutions?

"It is recognized in England, Canada and in America, in fact in every English speaking government, that the press is one of the potent factors in the establishment and maintenance of free governments known to an enlightened civilization. The framers of the Constitution of the United States and of our State Constitutions, were not unmindful of this fact when they wrote into these instruments provisions guaranteeing freedom of speech and of the press. A free government has never tolerated the muzzling of the press or the stifling of free speech. At most, it has only held those who enjoy its freedom answerable for an abuse thereof." (*Barton v. City of Bessmer,* 173 So. 626, 628; 234 Ala. 20, rev's'g 173 So. 621, 27 Ala. App. 413.)

The reason Americans are the best informed people in the world is that they enjoy the benefits of an untrammeled press. And the reason we have the best government in the world is that, by receiving all the news, the American people can, with intelligence based on knowledge, determine for themselves what policy will best serve them in the retention of their freedoms and in the further progression of their destiny toward an improved welfare and broader horizons of opportunity.

272

Were there a free press throughout the world today, one-third of its population would not be groaning under the yoke of bolshevistic despotism. The history of the tyrannical usurpation of the rights of the people in country after country during the last twenty-five years is the history of the shackling and muzzling of the press. If Hitler, Mussolini, and Stalin had not strangled the free newspapers in their respective realms, their subjects could never have been goose-stepped, straight-jacketed, and whipped into concentration camps, war, destruction, and despair.

There is not a civilized society where a free press is not as necessary as free schools. Moreover, newspapers serve the human race to a degree beyond the mere supplying of news. If there were no newspapers, a decent and orderly people would demand their creation. Newspapers are daily reminders that in life, eternal vigilance is the passport to safety, health, and happiness. With the story of every crime, accident, and untoward happening goes the unspoken preachment that the reader could himself have been the fateful and unfortunate recipient of the punishment, the injury, or sorrow related, if he had succumbed to the same temptation, or had been equally careless, or had allowed himself to be drawn into a web of pernicious circumstance similar to the one depicted in the columns which now engross his attention. But if a newspaper is curtailed in its freedom and is not allowed to present all the facts,—by means of pictures or language—the reader to that extent is deprived of the opportunity to be forewarned of the evil, as well as fortuitous, forces bent on wreaking havoc and destruction.

The Majority takes an extraordinary view of freedom of the press when it says: "whether or not freedom of the press is here involved is immaterial, since such freedom is subject to reasonable rules seeking maintenance

of the court's dignity and the orderly administration of justice." When one speaks of freedom of any kind, one naturally intends freedom within reasonable rules because what goes beyond the boundary of reasonableness is no longer freedom but aggression. Freedom of the press is not restricted to the operation of linotype machines and printing presses. A rotary press needs raw material like a flour mill needs wheat. A print shop without material to print would be as meaningless as a vineyard without grapes, an orchard without trees, or a lawn without verdure.

Freedom of the press means freedom to gather news, write it, publish it, and circulate it. When any one of these integral operations is interdicted, freedom of the press becomes a river without water. Gathering of news embraces photographing of the news, printing of the photographs, and reproduction of the photographs in the finished newspaper. To prohibit the taking of photographs is no less an infringement of freedom of the press than to prohibit the presence of a news reporter.

The action photo has become as much a part of the newspaper of today as the weather reports. To deny the newspaper reader pictures on the personalities and events of the day is to tear away one-half of his paper. Pictures have become wedded to the written word in the dissemination of the information in every field of human endeavor.

If pictures may be taken (and they may) with such care and caution in church that no one feels that the sacredness of the holy edifice has been violated, why should they be prohibited in a courthouse? It is a fallacious notion that courtroom pictures create disrespect for the law. The contrary is true. Pictures of court proceedings which are being properly and dignifiedly conducted can only increase confidence in the

processes of the law. To place a blinder over the lens of every press camera in the courthouse is to partially blindfold the people who have the right to know all of what is happening in the temple of justice.

Following World War II the whole world wanted to know and indeed had the right to know about the men charged with precipitating the global conflict which killed 20,000,000 human beings and so unbalanced the equilibrium of the earth that it still teeters on the brink of annihilation. Civilization wished to see the faces of those who could have engineered so frightful a catastrophe. The Allied powers and the judges of the International War Crimes Tribunal agreed that photography was in order and arrangements were accordingly made in the Palace of Justice at Nuremberg for the placing of cameras in the courtroom so that persons and proceedings could be photographed without interrupting in the slightest the orderly procedure of the historical trials about to unfold. The pictures which came from those cameras will assist mankind in devising means to prevent repetition of the acts of monstrous and unprecedented brutality revealed at the Nuremberg trials.

As one of the judges at Nuremberg I can attest that the courtroom photography in no way disturbed the procedure or the dignity of the trials.

## II.

The Majority Opinion in this case advances the rather peculiar argument that: "The taking of a picture of a person called for sentence certainly does not inform the public as to any material facts, and serves no purpose except to pander to the lower tastes of some individuals."

The object of printing is to inform, and when one is informed on any stated subject he is to that degree better equipped to face any particular adversary in the

battle for survival which never knows armistice. The public had the right to know about John Wesley Wable —for he was no ordinary person. He had become the consternation of the Pennsylvania Turnpike. While truck drivers lay asleep in the cabs of their vehicles, which were parked off the highway, refreshing themselves for the long and arduous journey still ahead, this uncommon human creature stole up on them and poured revolver fire into their heads in order to despoil them of their money and personal belongings. In the execution of this macabre banditry he killed two helpless and hapless motorists and seriously wounded a third. The public, not knowing the identity of this brutal assassin, referred to him as the "phantom killer." For many of the motorists on the turnpike, terror rode the bumpers of their cars. No one knew where the phantom, who had eluded all dragnets spread by the police, would strike next. A fog and mist of mortal apprehension hovered over Pennsylvania's famous thoroughfare. The newspapers carried front page stories on the "phantom killings", headlining and illustrating those stories with type and pictures appropriate to the momentousness of the sensational and tragic events.

Finally, on October 12, 1953, telegraph wires flashed bulletins from Albuquerque, New Mexico, that a John Wesley Wable, who was captured after a 30-mile automobile chase following the commission of a robbery, had on his person a pawn ticket for a watch taken from one of the victims of the turnpike killings. It was also ascertained that the calibre of his pistol matched the calibre of a bullet taken from the body of one of the victims in Pennsylvania. Because of this incriminating evidence, plus statements made by the prisoner, he was charged with murder and taken to Westmoreland County, Pennsylvania, to be tried for the murder of

276

Harry F. Pitts, who had been killed within the geographical confines of Westmoreland County.

Public interest in these sensational happenings crescendoed with the arrival of Wable in Pennsylvania, and the general public looked forward eagerly to the trial of the accused, which they expected to attend through the intervention of their newspapers which would report with story and picture the intense courtroom drama about to ensue. On March 1, 1954, the trial began. Some one hundred persons, who had consciously or unconsciously become members of the cast which had enacted the story of the turnpike killings and the later capture of the killer, were on hand, ready to testify. Practically all these persons were newsworthy. Among them were the defendant, his family, the family of the deceased truck driver, counsel for the prosecution and counsel for the defense, the jury, the trial judge, the girl in whose home Wable had lived at the time of the commission of the offense and her father, both of whom had given information which led to the defendant's ultimate apprehension, the pawn broker with whom the watch of one of the victims was pawned, the police officer who checked the records pertaining to the pawned watch, the deputy sheriff and other officers from New Mexico who participated in the chase and arrest of Wable, the Pennsylvania State Police, the ballistic experts, tire mark experts, and the photographer who had made pictures of the trucks and of tire marks involved in the fatal shootings. Many of these persons had been mentioned in the newspapers and it was only natural that the public wished to know what they looked like and how they would demean themselves as the curtain rose on the stage of the trial. The public, however, was to be disappointed. The Court of Westmoreland County promulgated a rule of

court forbidding the taking of pictures of any person connected with the case.

But the interest in Wable, as the central figure in the drama, was not one of "lower tastes," as characterized by the Majority. General human behavior was involved in this extraordinary and important happening. Did Wable represent a particular type of human being? Should motorists be on guard against such persons who looked like Wable? What *did* Wable look like? Vince Johnson, reporter for the Pittsburgh Post-Gazette and one of the defendants, testified: "The reason it [the Wable case] was covered so extensively is the case had aroused national interest; on top of that, the issue as to whether or not the correct man had been apprehended was certainly important to the motorists who used the Pennsylvania Turnpike, who would have a very personal interest in the safety of the Turnpike. It is for that reason that extensive coverage was given; it is for that reason we continued to cover the sentencing of Wable."

In affirming the decision of the Westmoreland County Court, the Majority of this Court does not offer one substantial reason as to why Wable should not have been photographed. What was to be gained in shielding this convicted murderer from photographers? Hiding him from the cameras almost implied concealment from the public of some mysterious fact. Why this secrecy? Secrecy, where events of public importance are involved, always suggests suppression, and suppression, in its own turn, generates rumors; and rumors, which are planted in the soil of suspicion eventually send forth the ugly plant of perverted truth.

Addressing itself to this very subject, the Supreme Court of Ohio has said: "The people have the right to know what is being done in their courts, and free observation and the utmost freedom of discussion of the

278

proceedings of public tribunals that is consistent with truth and decency tends to the public welfare." (*State v. Hensley,* 75 Ohio 255.)

Only recently the highest Court in the State of New York (December, 1954, *People v. Jelke,* 308 N.Y. 56), held that excluding the press and the public from a criminal trial constitutes a judicial nullification of the defendant's right to a public trial, and accordingly ordered a new trial. The Majority Opinion mentions this monumental decision only to dismiss it by referring to another case, but the principles enunciated in the case of *People v. Jelke* cannot be dismissed summarily. The Court of Appeals of New York State said: "A variety of purposes has been ascribed to the principle of publicity in judicial proceedings. Foremost is that of affording greater security to the individual in the administration of justice. In contrast to secret inquisitional techniques, which are alien to a free society, publicity serves as a safeguard against unjust persecution of an accused and goes far toward insuring him the fair trial to which he is entitled . . . 'The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power.' . . . Due regard for defendant's rights to a public trial demanded, at the very least—certainly, lacking valid legislative sanction—that *he be not deprived of the possible benefits of attendance by the press.*"

More extraordinary than some other observations made by the Majority in its Opinion in this case is the one which sardonically announces: "Court rooms and court houses are not places of entertainment, and trials are not had for the purpose of satisfying any sadistic instinct of the public seeking sensationalism." If this type of reasoning is to prevail, why not then shut out the public from all courthouses? Why not also bar to

the people the doors of the halls of the Legislature and the halls of Congress, for there may always exist the possibility that the drama of the courtroom and the excitement of legislative halls might cause "some individuals" to regard the courts and Congress as "places of entertainment"? This censure on the part of the Majority is in the nature of an indictment of the whole American public because interest in famous and important trials is as intense as the desire to follow the fortunes of baseball, football, and basketball teams. It is part of the enthusiastic knowledgeableness of the American way of life.

The argument of the Majority against public participation in the viewing of court proceedings is the same argument which in ancient days sought to defend star chamber proceedings, sanctioned secret inquisitions, and authorized the torture and the rack, which always operated beyond the eye of the public. Yes, indeed, why not turn back the clock of civilization and give unappealable power to judges? Let no records be kept, photographic or otherwise. By that process the public will never have an opportunity to satisfy their instincts—not for sensationalism, but for information as to what their supposed servants are doing.

To assume, as the Majority Opinion does in this connection, that the courtroom is a private prize fight presided over by a robed referee whose actions and decisions must not be subjected to public scrutiny is to lose sight of the inclination of human nature to usurp autocratic powers where public criticism is not left free to curb it. There is nothing in history to reassure the citizen who is concerned for the freedoms of his country that decisions affecting the welfare and destiny of his fellow-citizens, which are arrived at and rendered secretly, will be free of tyrannical tendencies and egotistical absolutism.

The Supreme Court of the United States originated the formidable utterance, already quoted, that: "The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." (*In Re Oliver*, 333 U. S. 257) On this subject the Supreme Court of Arizona also spoke with wisdom: ". . . Protection from oppression or arbitrariness of the courts, its officers, and the prosecuting officer, will be assured so long as trained and discriminating newspaper reporters are present at the trial, keeping close and critical watch of everything done and said, for the purpose of publication in the daily press. A larger public is made acquainted with the salient facts of the trial, even while it is progressing, through the press than it is possible to reach through the open doors of the courtroom." (*Keddington v. State*, 19 Ariz. 457)

### III.

In affirmation of the lower Court's decision, the Majority cites Canon 35 of the American Bar Association which reads: "Proceedings in court should be conducted with fitting dignity and decorum. The taking of photographs in the court room, during sessions of the court or recesses between sessions, and the broadcasting or televising of court proceedings are calculated to detract from the essential dignity of the proceedings, . . . degrade the court, and create misconceptions with respect thereto in the mind of the public and should not be permitted."

This Canon, adopted in 1937, was occasioned by the resentment properly felt by all men of the law over the circus-like atmosphere which reigned at the Bruno Hauptman trial in New Jersey. One looking in on that trial had to be edified with the spectacle of photographers leaping about like acrobats, while flash bulbs exploded, klieg lights glared, witnesses tripped over electric wires and broadcasting equipment, and specta-

tors periodically demonstrated. But this deplorable spectacle which startled the American Bar Association into enacting Canon 35 was not typical of the Courts of the United States. The melancholy breakdown of judicial control in the Hauptman trial was strictly an exceptional one and should not be held up as a general evil to be combatted. What happened at the Hauptman trial could not and would not be tolerated today in any Court worthy of the name. In addition, the photography of 1956 is to the photography of 1935 what the modern automobile is to the Ford T-model car of 1915. Tripods, flash powder, box cameras, and enveloping hoods are archaic. Small pocket cameras can now capture images so skillfully, unobtrusively, and inaudibly that the subjects and surrounding persons are unaware that a lens has been aimed and a photographic lever has moved.

The Majority Opinion states that Colorado has a Rule of Court similar to the one of Westmoreland County. It may be that at one time Colorado had such a rule, but if it ever existed it has dissolved in the tide of modern reappraisement of courtroom photography. In January of this year, Justice MOORE of the Colorado Supreme Court, acting on behalf of the entire Court, conducted hearings and experiments on the subject of Canon 35 of the American Bar Association. On February 27, 1956, the Supreme Court of Colorado unanimously adopted Justice MOORE's report, part of which declared: "We are concerned with realities and not with conjecture. Canon 35 assumes the fact to be that use of camera, radio and television instruments must in every case interfere with the administration of justice in the particulars above mentioned . . . For six days I listened to evidence and witnessed demonstrations which proved conclusively that the assumption of facts as stated in the canon is wholly without

support in reality. At least one hundred photographs were taken at various stages of the hearing which were printed and introduced as exhibits. All of them were taken without the least disturbance or interference with the proceedings, and, with one or two exceptions, without any knowledge on my part that a photograph was being taken . . .

"Only the regular lighting at all times functioning in the court room was used, and any court room with adequate sunlight for ordinary court proceedings would require no additional lighting . . . The dignity or decorum of the court was not in the least disturbed." (In Re Hearings Concerning Canon 35, 296 P. 2d 465, 568.)

As a result of these extending hearings and demonstrations, the Supreme Court of Colorado lifted the absolute ban against courtroom photography and authorized the judges in the State to determine for themselves in their own individual courtrooms, to what extent they would allow photography as well as radio and television broadcasting: "The broad discretion thus given the trial court affords ample protection against abuses of the constitutional right of freedom of the press, and will lead to a cooperative effort as between the judiciary and the press to protect, preserve, and portray the judicial process upon the level of justice to which it actually attains." (In re Hearings Canon 35, supra, p. 472.)

Canon 35 is not the formidable piece of artillery it once was. Its presence does not instinctively command fear, it does not engender awe. Indeed, upon examination it is found to be something less than a martial expression of incontrovertible truth and unassailable logic. In fact it somewhat exaggerates its calibre of factuality. For instance, it is something more than unadorned realism to say that the taking of photographs in a courtroom detracts "from the essential dig-

nity of the proceedings." And certainly it is rhetorical magnification to say that photography could "degrade the Court and create misconceptions with respect thereto."* This is being recognized more and more by the bench and bar of today. Recently the American Bar Association's public relations chairman reported that a special committee is studying the canon and implied it would recommend a sharp modification.** United States Attorney General Herbert Brownell, Jr., has suggested the desirability of "another look" at Canon 35. In Cleveland, Ohio, thirteen judges of the Cuyahoga County bench recommended to the American Bar Association that it re-examine the Canon. In the early part of this year, and while the present case was pending in this Court, Judge VINCENT A. CARROLL of the Court of Common Pleas of Philadelphia County allowed pictures to be taken during an important trial in his courtroom. Commenting on the experiment he said : "The photographers didn't interfere with the conduct of the trial as much as coughing in the spectator section of the courtroom did." Even today reports come in from Warren County that Judge ALEXANDER FLICK presiding there is allowing courtroom pictures of a robbery trial in his Court. The United States Court of Appeals and the Federal District Court for the District of Columbia have relaxed their rules for the taking of photographs in the courthouses, allowing, with the consent of the judges, photographing of any event other than a trial or hearing in which a judge of a court is presiding.

I have devoted this much time and space to discussing Canon 35 only because the Majority has wheeled

---

* This is connected up with "broadcasting of Court proceedings" which, unless done under the strictest supervision, could be disconcerting.

** Pittsburgh Press, September 4, 1956.

it into action in attempted support of its decision. In point of reality, however, even if Canon 35 had legal effect in Pennsylvania, which it has not, it could not touch the defendants. This Canon trains its fire on cameramen in courtrooms but the defendants in this case did not cross the threshold of the Westmoreland County courtroom devoted to the Wable sentencing on December 28, 1954. The defendant-photographers used their invisible cameras in the corridors of the first and fourth floors of the courthouse. The pictures on the fourth floor (floor of the courtroom) were taken prior to the convening of the Court and before the presiding judge had mounted the bench. The slight photographing on the first floor occurred after the Court had risen and was separated from the courtroom floor by three layers of steel beams, concrete, cement, heavy beams, stone and marble. Only a person possessed of a rather vivid imagination could conclude that the functioning of an invisible, inaudible camera could penetrate through this three-floor superincumbent barrier to disturb the dignity of a Court that was not convened—and not sitting in a courtroom that was empty and deserted.

The Majority Opinion goes on to say, however, that if this Court allows photographers to take pictures outside the courtroom it will be powerless to prevent them from invading the courtroom. One must read the Majority's language twice in order to be assured that a Court could utter so paralogistic a statement, but here it is: "But it must be conceded that if we sustain their contention that this rule of court infringes upon their rights of freedom of the press [to take pictures outside the courtroom], the court likewise would have no power to forbid the taking of pictures in the court room which were accompanied by no disorder or disturbance." This statement of the Majority might not dan-

gle so helplessly and futilely in mid-air if the Majority would go further and explain *why* the Court cannot forbid the taking of pictures inside a courtroom, even though it would declare itself powerless to forbid the taking of pictures beyond the courtroom or outside the courthouse or in the public square.

The Pennsylvania General Assembly, which, of course, is the only sovereign body which can speak for the people of the State, has spoken on the subject of contempt of court. §23 of the Act of June 16, 1836, P. L. 784, 17 PS §2041, limits the power of the courts to inflict summary punishments for contempt to: "III. To the misbehavior of any person in the presence of the court, thereby obstructing the administration of justice."

How can there be an "obstructing the administration of justice" when the act complained of cannot be seen, heard, or felt? The Sheriff of Westmoreland County, Howard Bud Thomas, accompanied the prisoner Wable for the specific purpose of preventing his being photographed. At the end of the journey he thought he had accomplished his purpose! What more effective testimony could there be that the photographing of the defendant was done without misbehavior?

The Majority, quoting from *Ex Parte Savin,* 131 U. S. 280, says: ". . . the Court, at least *when in session,* is present in every part of the place set apart for its own use, and for the use of its officers, jurors and witnesses; and *misbehavior* anywhere in such place is misbehavior in the presence of the court." But where was there any session of the Court? And where was there any misbehavior? Braden Leasure, deputy sheriff who was at Wable's side when the inaudible cameras clicked, testified: "Q. When you got off the bridge, and came onto the corridor on the first floor, did you notice any people around there? A. There were people on the first

floor, sure. Q. You didn't notice anybody that had cameras who were taking pictures? A. I didn't see any cameras, no, sir. Q. Did you notice any unusual commotion or disturbance of any sort? A. Oh, no, I didn't see any disturbance. Q. When you brought the prisoner into the court room from the rotunda, the long corridor on the fourth floor, did you notice any commotion of any kind there? A. No. Q. When you brought him downstairs, down the stairs to the first floor, did you notice any unusual commotion there? A. There was a lot of people gathered around the rotunda to watch him going down; they wanted to see the prisoner, that's natural. Q. No disturbance of any kind? A. I didn't see any." Thus we see that there was no disturbance, no commotion, no visible cameras. And certainly not a whisper of misbehavior. Where was there the obstruction of the administration of justice?

The Majority Opinion seems to proceed on the theory that the citation of many authorities, even though entirely irrelevant, because not applicable to the facts in this case, will supply legal substantiation to its conclusions. Thus, it quotes from the Federal Rules of Criminal Procedure, promulgated by the Supreme Court of the United States: "The taking of photographs in the court room during the progress of judicial proceedings . . . shall not be permitted by the court." How often has it been demonstrated, and admitted by the Majority, that the photographs in this case were not taken in a courtroom and not taken during the progress of judicial proceedings?

The Majority Opinion, again accentuating the irrelevant and emphasizing the extraneous, says: ". . . this Court has adopted Rule 223 of the Pennsylvania Rules of Civil Procedure, which has the effect of a statute, and which provides: 'During the *trial of actions* the court shall prohibit the taking of photographs and

motion pictures in the court room and the transmission of communications by telegraph, telephone, or radio in or from the court room." But in the case at bar, no photographs were taken "during the trial of actions", and there was "no transmission or communications by telegraph, telephone, or radio in or from the court room."

IV.

The Majority says further that Wable was "entitled to the safeguard of his individual right of privacy," and that the lower Court owed him a duty to protect him from "invasion of his rights by the press as well as the public" since "he was a ward of the court". But Wable was a defendant in a murder prosecution, and to speak of privacy at any public trial is to speak of privacy in a show window.

The most striking and indeed most vital feature of a criminal trial in America is the very fact that it is public. If, on the basis of a defendant's right of privacy, he is not to be photographed, reporters then should be prohibited from describing him in written language, because a skilled and experienced writer can often draw a word picture which can be as revealing as a photograph. Thus, press artists should also be prohibited from drawing pen-and-ink sketches of an accused.

Rights of privacy, like so many rights, are relative. Everyone who lives in an orderly community is called upon to relinquish certain inherent prerogatives in exchange for the great benefits which would not be his in a primitive or hermitic state. Protection against robbers, fires, floods, violence are the returns the citizen enjoys from his investment in Human Society, Incorporated. Nor do I believe that party litigants and witnesses expect the isolation and privacy of their homes when they enter a courthouse. They may dis-

like being photographed as they may dislike being cross-examined, but they know that in this instance their business is the public's business and the public has the right to know what is transpiring. One cannot stand at the crossroads of the world and expect the solitude of a cloistered cell. The United States Court of Appeals, Third Circuit, speaking on this subject, declared that one's "interest in being left alone" is "overbalanced by the general public interest in being kept informed." (*Leverton v. Curtis Pub. Co.*, 192 F. 2d 974, 976.)

Where one becomes the subject of legitimate public interest, the printing of his name or picture does not constitute an actionable invasion of the right of privacy. In the case of *Berg v. Minneapolis Star and Tribune Company*, 79 F. Supp. 957, the plaintiff sued the owner of a newspaper, contending that the newspaper had invaded his rights of privacy by printing a picture of him taken during a hearing in divorce proceedings which he had instituted against his wife. The United States District Court (Minnesota) held that his complaint lacked merit: "The plaintiff does not contend that the article accompanying the photograph in any way presents an inaccurate or distorted picture of the proceedings. Nor is it contended that the picture depicts him in any other light than the normal or natural pose. In other words, if the news item constitutes legitimate news the picture seems entirely appropriate to the news. If the court, therefore, is correct in holding that the news published by the defendant regarding the custody proceedings constitutes a legitimate news item, and it would seem that no other view can be entertained under the admitted situation, it must follow that the publishing of Berg's picture in the manner indicated did not violate any right of privacy which the law may afford . . . The note writer in

138 L.R.A. who covers in an extended article the subject of the right of privacy, states on page 78 that 'it is settled that the publication of a person's name or picture in connection with the news or historical event of legitimate public interest does not constitute an actionable invasion of the right of privacy'."

When an individual, willingly or unwillingly, becomes part of a public event, his rights of privacy decrease in proportion to the rights of the public to know what has transpired. This is not in derogation of his constitutional privileges, but in defense of the welfare of the public, of which he is an integral part. The person who is unfortunately injured in a railroad accident may not legally complain because the camera photographing the event includes him in the sweep of its lens. The man who has the misfortune to be robbed becomes an unwilling part of an event which has entered into the public realm. His right not to be photographed must bow to the superior right of the public to be protected; and part of that protection could well lie in photography which can help in the search for and the apprehension of the robber. The man who himself has been implicated in crime cannot object to being photographed any more than he can object to being questioned by the police and finger-printed, and, if indicted, to being tried, even though it should develop eventually he is innocent. A fortiori, one who has actually been tried and convicted of crime becomes part of the public business of the State and he has no right to withhold from the public his picture any more than he can withhold from the public the story of his crime.

Suppose that while a defendant is being taken to or from a courtroom, a mob should try to seize him, does this Court intend to hold that under those circumstances no pictures could be taken? Suppose, while the prisoner is in transit through the courthouse, a

fire should break out or a stairway collapse, would cameramen be required first to obtain signatures of all persons in the scene before they could take a picture which would inform the public and the authorities of the threatened or happened calamity?

In the case of *Jones v. Harold Post Co.*, 230 Ky. 227, the Supreme Court of Kentucky said: "There are times, however, when one, whether willingly or not, becomes an actor in an occurrence of public or general interest. When this takes place, he emerges from his seclusion, and it is not an invasion of his right of privacy to publish his photograph with an account of such occurrence."

The Supreme Court of Colorado in the citation already referred to (In re Hearings Concerning Canon 35, 296 P. 2d 465), speaks of rights of privacy under Canon 35 as follows: "To uphold Canon 35 on the ground that it prevents a violation of the individual's 'right of privacy' would be to repudiate the provision of our constitution by rule of court, and to make effective the prior restraint upon freedom to publish, although the constitution expressly prohibits such restraints by clearly indicating that the remedy for abuse of the constitutional right to publish 'whatever he will on any subject' is that the publisher shall be 'responsible for all abuse of that liberty.' How can it be contended that the prior restraint upon conduct imposed by the canon is valid when the constitution clearly indicates that the remedy for abuse of the 'right of privacy' must be compensatory in its character?" (p. 470).

In the case of *Themo v. New England Newspaper Publishing Co.*, 306 Mass. 54, 58, the Supreme Court of Massachusetts said: "The present cases do not require us to decide whether any right of privacy is recognized by the law of this Commonwealth. If any exists, it does not protect one from having his name or his like-

ness appear in a newspaper when there is legitimate public interest in his existence, his experiences, his words, or his acts."

Perhaps the most startling proposition in the Majority's Opinion in the case at bar, is the inference that Wable's right of privacy had to be protected because it was within the realm of possibility that Wable might later be found innocent, for, the Majority points out, "it needs no citation of cases to prove that many innocent persons have been found guilty and sentenced upon criminal charges, and later released when their freedom from guilt has been established." This solicitude on the part of the Majority seems to me to be a wholly unnecessary precaution. All the protection in the world against the publication of Wable's picture will be of little avail to him. He can never be released from prison.

Wable is dead.

Wable was executed and his bones have been buried deep in the ground he stained with the blood of the victims he killed. I cannot refrain from uttering at this juncture the observation that it must come as a surprise to the public, if not a shock, to learn that after rendering the decision which authorized Wable's electrocution, the Majority now suggests the possibility that Wable might conceivably have been innocent. Since I participated in the decision which affirmed Wable's conviction of murder in the first degree, I hasten to state without equivocation that not the thinnest shadow of a doubt crosses my mind that Wable was guilty of premeditated murder and that, so long as capital punishment remains part of the law of the land, he richly deserved what he received.

There can be no justice in any certain decision unless there is a meeting of the minds on the facts. The decision of the Majority in this case is a stranger to

justice because it is based on a premise which has no factual existence. The Majority asserts that the rule of the Court below was instituted for the "dignity of the court and the decorum of trial." But the defendants here did not disturb the dignity of the court, nor did they disconcert the decorum of a trial. There was no trial on the day the photographers appeared, and, as already stated, the defendants did not once enter the courtroom. Thus, the Majority is arguing for a dignity which was never ruffled and spiritedly defending a decorum which was never jostled. As heretofore declared, the judges did not know that pictures were being taken. In fact, as repeatedly asserted in this Opinion, no one, with the exception of the photographers themselves, were aware that cameras had been operated.

## V.

Up to this point I have discussed the merits of this case insofar as substantive rights are concerned, but there is even a more momentous reason for declaring the Court's decision here a monumental error. That reason points to a gaping niche which should never be left unfilled in a Court's decision, namely, fairness. A tribunal's judgment which overlooks the elements of square dealing can never achieve the respect which should be an inseparable adjunct of any adjudication in the law. The defendants in this case are being stigmatized and punished for an Act which this Court invited and authorized.

On February 25, 1954, the Courts of Common Pleas, Quarter Sessions, Oyer and Terminer and General Jail Delivery of Westmoreland County promulgated an order which in effect prohibited photographers from approaching or entering the courthouse or jail of Westmoreland County. The strict application of the order

meant that the public in Westmoreland County would be denied pictorial news heretofore embraced within the purview of newspaper service.

The Tribune Review Publishing Company and the Pittsburgh Post-Gazette decided to test the workability of the order and accordingly sent photographers to the Greensburg courthouse to take pictures of principals and witnesses in the Wable trial. The Sheriff of Westmoreland County halted the photographers and ordered them to deposit their cameras in his office. He also warned them that any attempt on their part to defy the photographic ban would result in dire consequences to them. Confronted with this legal stone wall in the only State court to which they could apply for relief the Tribune Review Publishing Company turned to the Federal courts, averring denial of due process of law. Acting under the provisions of the Act of Congress of June 25, 1948 (28 U.S.C.A. 1343), this Greenburg publishing firm, later joined by the Pittsburgh Post-Gazette as intervening plaintiff, petitioned the United States District Court of Western Pennsylvania for a restraining order to prevent the Sheriff of Westmoreland County from enforcing the restrictions of the order in question. A temporary restraining order issued the same day. The Sheriff then made a motion that the Court dissolve the restraining order, and, on this issue joined, the District Court went into an extensive hearing on the matter. Numerous witnesses were heard, and nearly 300 pages of testimony were taken on every phase of the controversy.

On March 12, 1954, the United States Court, speaking through Chief Judge GOURLEY, ordered, directed and decreed that "proceedings in this court be stayed pending a determination of proceedings to be brought with reasonable promptness in the Supreme Court of Pennsylvania to have adjudicated the legality of the

order or regulation issued by the Courts of Westmoreland County."

With reasonable promptness the Tribune Review Publishing Company, with its publisher David W. Mack, applied to this Court for a writ of prohibition against the judges of the Courts of Westmoreland County on the ground that their rule of court contravened the rights of the petitioners under Article I, Section 7 of the Pennsylvania Constitution, and under the 1st and 14th Amendments to the Constitution of the United States, being an abridgement of the rights of the petitioners to freedom of speech and of the press. The judges of the Courts of Westmoreland County filed an answer to the petition for the writ of prohibition and both sides then prepared, published, and presented to this Court extensive briefs on the question at issue. The Pennsylvania Newspapers Publishers Association intervened as an additional party plaintiff and filed a brief. The National Press Photographers Association, acting as amicus curiae, filed a brief. The case was presented to this Court in an oral argument which lasted four or five hours.

On June 29, 1954, the petition for a writ of prohibition was dismissed, not because of any lack of merit in the petitioners' argument in behalf of freedom of the press but because, this Court said, no justiciable question was involved in the lawsuit. However, the dismissal was not conclusive; it did not close the books on the controversy; it did not seal the Court's judgment. It in fact invited the petitioners to try again. The Opinion announced: "Such dismissal is made without prejudice as to the merits of the question presently raised or any future consideration thereof if presented in a proper case."

In order to reassure the petitioners that this Court stood ready to re-hear the matter, the Court emphasized

at the end of the Opinion: "The petition is dismissed without prejudice." But even before these written reassurances to the effect that the final question remained undecided, oral overtures had been made, during the argument, by one or two members of the bench that if the petitioners or others in their behalf challenged the lower Court's rule directly, and this challenge was followed by prosecution, this Court would then welcome the determination of the undecided question. The present Opinion writer stated from the bench at the time that he did not approve of such a procedure because it implied that the Law itself was invoking a violation of its own precepts. Furthermore, he saw no necessity for another lawsuit. All the ingredients for a definitive adjudication were at hand.

Even the Court which had formulated the Rule conceded that the elements for a final decision on the Rule were present when the case was before us in June, 1954. In their brief, speaking through their attorneys, the majority of the Court of Common Pleas, Court of Quarter Sessions and Court of Oyer and Terminer of Westmoreland County said at the time: "The Sheriff of Westmoreland County was instructed by the Court to enforce and prevent the violation of the said Rule of Court. On the first day of March, 1954, . . . David W. Mack, one of the petitioners in this case, after causing the Sheriff to be notified of his intention, acquired the services of a photographer, Castle J. Pyle, and accompanied him to the Westmoreland County court house for the purpose of testing the validity of the said Rule of Court and the right of the Sheriff to enforce the same. The said David W. Mack and Castle J. Pyle were advised by the Sheriff that should they attempt to take photographs in the court house during any session of court or the recesses between sessions of court,

*they would be apprehended and taken before the court
for appropriate action."*

What more was required? Was Pyle's camera to be
smashed and his body cast into prison before the action
would be ripe for adjudication? When the Sheriff
warned Pyle that if he attempted to take a picture, he
would be punished, there came into being a fait ac-
compli which required this Court, upon suitable peti-
tion, to decide whether a writ of prohibition should or
should not issue against the Court charged with violat-
ing constitutional rights.

The majority of this Court said in June, 1954, that
a new case should originate in Westmoreland County
so that this Court might have the benefit of the views
of the Court which had authored the controverted Rule
of Court. But to ask for the views of the lower Court
in this matter was like seeking owls in Athens. That
Court had already spoken decisively and unequivocally,
both in words and deeds. It is my earnest belief that
the Westmoreland County Court would not have im-
posed the sentences entered in this case were it not that
it felt compelled to do so by this Court's decision in
June, 1954. The Westmoreland Court had promul-
gated its Rule of Court; it had warned the petitioners
that if they violated it, they would be punished. But,
by its decision, this Court in effect said that one thing
more was required: a penalty had to be imposed before
it could take jurisdiction.

Certainly nothing else was needed in the way of in-
formation or argument. The Court below had sup-
plied a 39-page brief. We had the benefit of 300 pages
of testimony taken in the United States Court as well
as the exhaustive 41-page Opinion of Chief Judge
GOURLEY in that Court. It is inconceivable that any-
thing more could have been added by the parties by

way of testimony or citation of authorities. Nevertheless this Court ruled that the petitioners should return to the starting place and travel again the path which would lead to the place they now were.

The petitioners followed the Court's recommendation. David W. Mack got himself arrested. In an abundance of acquiescence with this Court's desires, six others of the Fourth Estate also submitted themselves to arrest, satisfied that the test would enlighten the newspaper profession on what its rights were in a situation of this kind. Instead, however, of being legalized experimentees in a court-authenticated test, the volunteers found themselves convicted of criminal contempt and sentenced to five days' imprisonment plus the payment of fines and costs. When the smoke cleared away they appealed to this Court with the undoubted assurance that since they had only done what had been suggested by this Court, the convictions would be reversed and the world informed on the legality and constitutionality of Rule No. 6084.

On January 13, 1956, the whole affair came before this Court again. The many-times-told tale was told once again. The same arguments which had been previously made by the attorneys were again expounded at length, and the same situations which had been previously examined were once more explored. But this time the Court was willing to render a decision, and today that decision has been announced. It has affirmed the conviction. It, however, has modified the sentence. It tempered the wind to the shorn lamb by extracting from the gale of punishment the teeth of imprisonment. In explanation of this grace, the Majority of the Court says that "these are 'test' cases." But if these cases are test cases for the purpose of saving the defendants from prison, they have to be test

cases for the purpose of relieving them, not only from the payment of fines and costs, but from the judgment of guilt which, in the republic of honor and reputation, can be as hurtful to the spirit as a few days' imprisonment can be to the body. A test cannot be a half-test. It either is a whole test or it is not a test at all. It cannot be half-test and half-defiance. It cannot be half-amicable and half-bellicose.

The Court's modification of the sentence is damning with faint leniency. The defendants are entitled to an outright acquittal. Anything less than that is, in my estimation, a reflection on this tribunal. The defendants are not criminals nor have they done anything suggestive of contempt for court or law. They are men of excellent name and reputation, they committed no offense—legal, moral, or civic. They performed an act of public service. They sought light where there was darkness, they asked for clarification where there was ambiguity, they petitioned for a determination of their constitutional rights. They worked with the law, not against the law.

At the time the pictures were taken, William Block, publisher of the Pittsburgh Post-Gazette said: "Certainly no one wishes to interfere with the orderly procedures of the courtroom or in any way detract from the dignity of the court." David W. Mack, publisher of the Greensburg Tribune-Review Publishing Company, said: "The picture taking was not done thoughtlessly but thoughtfully." The other defendants acted with dignity and decorum in the accomplishment of their designated mission. They caused no disturbance, they offended no person, they displayed no attitude suggestive of contempt or disdain for the Court.

At the hearing in Westmoreland County on April 12, 1955, no verdict of criminal contempt would have

been possible on the presentation of the prosecution's case alone. None of the Commonwealth witnesses testified that the defendants had taken pictures. It was the candor of the defendants themselves which made possible the reconstruction of the whole event, the narrative of which so clearly revealed that the culminating episode was the result of this Court's urging of a test case. For this Court now to declare the defendants guilty of criminal contempt, when they acted on the recommendation of the Court, is to write a judgment on a parchment of insensibility bearing the seal not of justice but of injustice.

## VI.

To let this verdict of guilty stand is to avow entrapment. No agency of government may constitutionally induce a law-abiding citizen to perform an act which the government intends to prosecute as an illegal act. The Supreme Court of the United States has said that "it is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it." ( *Sorrells v. United States,* 287 U. S. 435, 444.) The highest court in the land said further that "the Government cannot be permitted to contend that he [the accused] is guilty of a crime where the government officials are the instigators of his conduct."

That this Court did not consciously intend entrapment does not alter the clearly etched configuration of the picture of entrapment. The decision being rendered today by this Court could have been pronounced in June, 1954. The legal question which was eventu-

ally to be passed upon was as obvious as the morning sun from the very inception of the controversy. All that has followed since the summer of 1954 could have been avoided by this Court. When the Westmoreland County Court announced its Rule in February, 1954, the rights and the obligations of the defendants had taken concrete form. It was unnecessary for them to subject themselves to criminal proceedings in order to have those rights and obligations adjudicated. If the Westmoreland County Court had, by Rule of Court, prohibited the general public from entering the court-house, this Court could certainly have intervened to strike down so obviously unconstitutional a ban. The fact that the ban was something less than a wholesale prohibition does not lessen the power of this Court to determine the constitutionality of the rule actually made. This Court has the duty to pass upon any action of a lower Court which is charged with jeopardizing the constitutional rights of the people. We have so declared many times.

The Tribune Review Publishing Company, publishing newspapers at the county seat of Westmoreland County, had for years taken photographs in about the courthouse in Greensburg. Suddenly that right was voided. It was not asserted anywhere that public security, public health, or public morals dictated the photographic interdiction. Depriving the newspapers of photographic privileges materially affected the property rights of the owners. They were, on that score alone, entitled to due process of law in the determination of the question as to whether an illegal confiscation had taken place.

In refusing the writ of prohibition requested in June, 1954, this Court said that it "cannot undertake to revise or edit rules adopted by courts of inferior jurisdiction unless and until their application—not their

threatened but their actual application—gives right to a grievance subject to appellate review and remedy." In order to get the "actual application," which this Court asked for, were the newspaper photographers required to undertake violence by brandishing their cameras in the face of the Sheriff of Westmoreland County who was standing by with admonitory guards and threatening deputies? Did this Court need that kind of an upheaval as a basis for passing upon the constitutional rights of citizens of the United States?

This Court has never said before that it could not intervene where a lower Court was charged with abusing its power. In fact it has on numerous occasions declared just to the contrary. In the case of *Carpentertown Coal & Coke Co. v. Laird*, 360 Pa. 94, we said: "The power of controlling the action of inferior courts is so general and comprehensive that it has never been limited by prescribed forms of procedure or by the particular nature of the writs employed for its exercise. It may further be pointed out that Article V, section 3 of the Constitution expressly permits the exercise by this Court of original jurisdiction in cases of mandamus to courts of inferior jurisdiction, and prohibition is the exact counterpart of mandamus, the only difference being that the latter commands certain things to be done whereas prohibition forbids the doing of certain things which ought not to be done."

It has not been necessary in the past, where a lower Court threatened an illegal or unconstitutional act, that the citizen had to subject himself to the threatened illegality before this Court could order a writ of prohibition to restrain the abuse of constitutional power. In *Park's Petition*, 329 Pa. 60, this Court, on the petition of the district attorney, issued a writ of prohibition to prevent the assignment of a County Court judge to hold court in the Court of Oyer and Terminer in Al-

legheny County. In the case of *Communist Party Petition,* 365 Pa. 549, this Court issued a Writ of Prohibition abating an order of the Court of Quarter Sessions of Allegheny County which had padlocked the premises of the Communist Party in Pittsburgh. In *McNair's Petition,* 324 Pa. 48, the petitioning mayor obtained an order from this Court prohibiting a grand jury investigation.

In the case of *Carpentertown Coal & Coke Co. v. Laird,* 360 Pa. 94, supra, this Court explained that: "It [the writ of prohibition] does not seek relief from any alleged wrong threatened by an adverse party; indeed it is not a proceeding between private litigants at all but solely between two courts, a superior and an inferior, being the means by which the former exercises superintendence over the latter and keeps it within the limits of its rightful powers and jurisdiction."

Over and over this Court has made clear that if a lower Court exceeds its power, the Writ of Prohibition will be utilized to bring it back to its proper boundaries of jurisdiction: "There has always been the limitation on this power [of a Court to make rules for the transaction of its business] that rules of court must not be contrary to law or unreasonable . . . A court cannot by rule divest itself of a duty which is placed upon it by law . . . Nor can a rule divest a citizen of a legal right." (*Equipment Corp. of America v. Primos Vanadium Co.,* 285 Pa. 432, 435.)

If this Court had given heed to its own authoritative utterances, it would have declared in June, 1954, that the controverted Westmoreland County Rule of Court was constitutional or unconstitutional—and that would have terminated the litigation. Instead, however, of deciding the issue squarely brought before it, the Court paved the way for further proceedings by declaring, as already stated: "Any action, whether in the

nature of contempt proceedings or otherwise, which is brought to test the validity of the rule complained of, should be initiated in the court of its authorship."

This Court later acknowledged that it had authorized the test, when the Majority stated on May 25, 1955: "The order of this court in the *Tribune* case . . . held that there was nothing justiciable before us for decision, dismissed the petition without prejudice, and *suggested that a proper test case might be presented.*"*

It is unnecessary to add that the suggestion of the highest Court of the Commonwealth implies as much an obedience as did the invitation of the monarchs of old. And that this Court then accepted the present case as the test it "suggested" is conclusively established by its statement, also made on May 25, 1955: "A *test case has since been instituted* and decided in the Court of Common Pleas of Westmoreland County, has been appealed to our court, and will be argued at the Fall Session of the court in Pittsburgh."**

That "test case" is the one before us now. The defendants faithfully followed this Court's instructions, they acted to "test the validity of the rule complained of," they initiated the proceeding in "the court of its authorship." And, as a consequence, they are being branded by this Court, of violation of law. This is the strangest procedure I have witnessed in all my many years at the law.

In a pleading filed in the Dauphin County Court of Common Pleas on December 8, 1954 (1 D. & C. 2nd 535), the following statement appears in connection with a proceeding related to the controversy over Westmoreland County Rule of Court No. 6084: "At the consultation on November 9, 1954, the Chief Justice re-

---

* *Musmanno, Appellant v. Eldredge*, 382 Pa. 167, 169.
** *Musmanno, Appellant v. Eldredge*, 382 Pa. 167, 169.

lated to the entire membership of the Court that he had made several efforts to have an amicable test case begun in Westmoreland County. He stated that he had spoken to counsel for the petitioners and he related that he also had had interviews with various judges of the Westmoreland County bench on the subject of amicable test action. It was stated further that one or more of the other Justices were present at the interview with the Westmoreland County judges."

This conference or conversation between members of this Court (the present writer was not present) and members of the Westmoreland County Court further demonstrates the "testing" nature of the whole proceeding.

The Majority Opinion fails to answer the question which must suggest itself to anyone who has followed the vicissitudes of this over two-year-old litigation, namely: Why has this Court affirmed a rule of court which, while definitely abridging the rights of the public, meets no need of the public? Where liberties are limited in any way, there must be an overriding purpose to be served. But where is the danger that is to be met, where is the evil to be confronted, where is the threat to be faced?

The Rule of Court which this Court is affirming is an anomaly in Pennsylvania. In Allegheny County, where the court business exceeds that of Westmoreland's by many times, photography is permitted anywhere in the courthouse except in courtrooms actually in court session. Nor is there any restriction on the photographing of defendants moving to and from court. In Philadelphia, the largest county in the Commonwealth, pictures may be taken without restraint in the corridors of City Hall which houses most of the Philadelphia courts, as well as the Superior and Supreme Courts of Pennsylvania.

How can this Court approve a rule in one county which has no counterpart in the other counties? On what foundation of law, logic, or abstract justice may this Court build a judgment which pronounces the defendants in this case guilty of criminal contempt in Westmoreland County when others who performed the same acts in Philadelphia and Warren Counties suffer no legal penalty? What makes a wholesome test in Westmoreland County an illegality while a similar test in Philadelphia County is free of taint? Lawyers and lay citizens have the right to expect consistency in the law. Where is there the consistency in the present state of affairs? Where is there the harmony of decision which should symbolize the jurisprudence of a Commonwealth?

I submit that it is most unjust to punish these defendants for cooperating with the highest Court in the Commonwealth. As wise as are the defendants in the ways of life, being experienced newspaper men, it would never have occurred to them that the Supreme Court would not stand by with life preservers to save them in the event that the ice, which they had been urged to test, might have broken under their weight.

From time immemorial judges have been proclaiming that ignorance of the law is no excuse for its violation, but this will be the first time in the history of our revered Commonwealth where men can be punished for following the instruction of judges.

I dissent to the ultimate.