## *Ex Parte* WILLIAM STURM ET AL.

### *Contempt of Court—Disobedience to Order—Taking Photographs of Prisoner—Rights of Newspaper Representatives.*

The judge of the criminal court had power, for the protection
of one about to be tried for murder, to pass an order forbidding
the taking of photographs of the prisoner in or near the court
room, and also to demand the surrender of the plate of such a
picture taken shortly previous to the passing of the order.

pp. 118-124

The liberty of the press does not include the privilege of
taking advantage of the incarceration of a person accused of
crime to photograph his face and figure against his will.   p. 120

That one who had taken a photograph of the prisoner, under
such circumstances, when called upon by the judge to surrender
the plate to him, handed him a blank plate, retaining that used
by him, was misbehavior by him in the presence of the court,
within Code, art. 26, sec. 4, naming such misbehavior as a ground
for summary punishment as for contempt.                      p. 120

The judicial power to punish for contempt is a common law
power, possessed, independently of statute, by courts of consti-
tutional origin.                                             p. 120

Judicial tribunals have the power to enforce their own judg-
ment as to what conduct is incompatible with the proper and
orderly course of their procedure.                          p. 121

Md.]

The constitutional right of one accused of crime to a public trial is a privilege intended for his benefit, and it does not entitle the press or the public to take advantage of his involuntary exposure at the bar of justice to picture his plight by means of photography. p. 122

The privilege of the public to attend trials in court is not unrestricted, and the trial court has some discretion as to whether any part of the public shall be excluded. p. 122

That a photographer is able to take a picture in court without noise or distraction, and without the knowledge of the judge, does not justify him in ignoring a positive judicial order forbidding the use of cameras at the trial. p. 123

A judgment imposing a fine for criminal contempt, in violating an order within the legitimate scope of the court's authority, is not appealable. pp. 124-126

*Decided January 21st, 1927.*

Appeals from the Criminal Court of Baltimore City (O'Dunne, J.).

Proceedings against William Sturm, William Klemm, Earl C. DeLand, Harold Elliston, and Harry Clark, for contempt of court. From a judgment of conviction as to each of said defendants, they separately appeal. Appeals dismissed.

The causes were argued before Bond, C. J., Urner, Adkins, Offutt, and Parke, JJ.

*George Weems Williams* and *William L. Marbury, Jr.,* for the appellants.

*Jesse N. Bowen* and *William C. Coleman,* as *amici curiae.*

Urner, J., delivered the opinion of the Court.

The five appellants were adjudged to be in contempt of the court below for violation of its orders in regard to the taking, for publication, of photographs at the trial of Richard Reese Whittemore on an indictment for murder. About half an hour before the beginning of the trial in the Criminal

Court of Baltimore City, a flashlight photograph of Whitte-
more, as he was entering the lockup in the court house, was
taken by a staff photographer of the Baltimore News.   The
noise of the flash operation was heard by Judge O'Dunne in
his private office adjacent to the court room.   He at once had
the photographer, William Klemm, brought to his office, and,
after stating that an order was about to be publicly announced
in the court room prohibiting the taking of pictures, he told
Klemm that the picture which had been taken of Whittemore
would have to be surrendered.   Klemm then removed from
the camera and handed to Judge O'Dunne a plate on which
the picture of Whittemore was understood by the judge to
have been taken, and the photographer was then allowed to
depart.   The plate given to the judge was a blank one, which
Klemm had placed in the camera immediately after photo-
graphing Whittemore, the plate used for that purpose having
been withdrawn by Klemm and put in his pocket.   This fact
was not mentioned to Judge O'Dunne, but he was misled by
the photographer into the belief that the plate actually used
in taking the picture of Whittemore was being delivered into
the court's possession.   In ignorance of the deception thus
practiced, Judge O'Dunne entered the court room, and, after
opening the session, made a statement from which we quote
as follows:

"In my judgment it is not compatible with judicial dignity
or the dignity of the administration of the law, to allow the
court room to be used, or the precincts of the court, for the
taking of any photographs for moving pictures or the press
or any other agency.   One such picture has been taken this
morning in the lockup and has been confiscated.

"The Baltimore Sun asked over the phone whether the
privilege was going to be allowed to take pictures and they
were told 'no,'—which, of course, not only applies to them,
but, impartially, must apply to everybody and every agency,
and any breach of this decorum of the court by any person
or persons of whatsoever agency will be treated as a contempt
of court. * * * The prisoner is in the precincts of the court,
under the protection of the court, and is not able, therefore,

to protect himself, and he will be protected by this court from any publicity of that character."

After this announcement, William Sturm, another photographer of the Baltimore News, who was in the court room, sent a message to Mr. Clark, the city editor of the News, informing him of the court's order against the taking of photographs, and received in reply from Mr. Clark instructions to "go ahead and take the pictures." This he proceeded to do, and in the course of the day took seven pictures, using a small camera while seated at the table provided for representatives of the press, of whom there were about twenty in attendance. The camera was used secretly, and the trial judge was not aware that his order was being violated. Two of Sturm's photographs, showing the group at the trial table, including the prisoner and his counsel, and the prosecuting attorneys, were reproduced in the regular editions of the Baltimore News on the first day of the trial, and in the first edition of the Baltimore American, published under the same ownership and control, and issued early on the morning of the following day. In those editions of the two papers the picture of Whittemore taken by Klemm also appeared.

After learning of the publication of the pictures, Judge O'Dunne instituted contempt proceedings, which included citations of the managing editors of the News and American, the city editor of the News, and the two photographers. At the hearing on the contempt charges all of the cited defendants testified with evident candor. The subterfuge which made possible the use of the "lockup" picture of Whittemore was freely admitted. Mr. Clark, city editor of the News, frankly stated that he directed Sturm to disregard the order forbidding the use of cameras in the court room, and that he had the pictures developed, submitted them to the managing editor of the News and published them, notwithstanding the court's prohibition. He also ordered the development and publication of the "lockup" picture, although he was informed of the deceptive means by which the court's effort to prevent its use had been frustrated. Mr. Ellison, managing editor of the News, testified that he authorized the publica-

tion of the pictures with knowledge that they had been obtained in circumvention of the trial judge's purpose and orders to the contrary. The issue was plainly and definitely stated by Mr. Ellison when, in explaining why he authorized the publication of the pictures although he knew of the court's prohibitive action, he said: "I don't believe the court has the right to forbid the taking of pictures in the court."

Mr. DeLand, managing editor of the American, testified that when the first edition of that paper, containing the Whittemore "lockup" and trial pictures, was printed and issued, he did not know of the court's action in reference to such photographs, and that upon becoming informed on the subject, he had the pictures excluded from the later editions. The report of the trial in the first edition of the American referred to the prohibitory order, but this escaped Mr. DeLand's notice until that edition had been printed and was being distributed.

The fundamental question in the case is whether the trial judge had competent authority to forbid the removal of the picture of Whittemore taken at the entrance to the lockup before any order against the taking of pictures had been announced, and to prohibit the use of cameras in the court room during the progress of the trial. For the purposes of the present inquiry, it is not necessary to consider whether, in the absence of inhibition by the court, the acts of the photographers and the editors, in securing and publishing the pictures in question, would make them legally subject to prosecution for contempt. It was for the deliberate violation of the court's mandates that the charges of contempt were preferred. The effort of the court was to prohibit the taking of pictures in or near the court room with a view to their publication. It was not merely to preserve the dignity and decorum of the tribunal, but to protect the prisoner and other participants from an unnecessary and perhaps objectionable degree of publicity, that the preventive measures were adopted. There is consequently no reason to restrict the application of the court's order to the

mere act of taking photographs, when the purpose to pre-
vent the publication of pictures procured in that manner
was unmistakable.

If it was within the proper scope of the trial court's author-
ity to protect the prisoner from photographic exploitation,
and the sessions of the court from possibly disquieting
activities, by the orders which have been challenged, then
it is clear that they could not be violated with impunity.
Contempt of court has been defined as: "The disobedience
or resistance of a lawful order of a court or judge." *Rapalje
on Contempt*, sec. 16. It was said by Justice Brewer for
the Supreme Court of the United States, in the case of *In re
Debbs*, 158 U. S. 594: "But the power of a court to make
an order carries with it the equal power to punish for a
disobedience of that order, and the inquiry as to the ques-
tion of disobedience has been, from time immemorial, the
special function of the court." As to the existence of
requisite power in the court below to accomplish the pur-
poses to which its action in this case was directed we can
have no doubt.

The picture of Whittemore taken at the lockup in the
Court House shows that he tried to shield his face from
exposure to the camera. It was evidently against his will
that he was photographed in such a situation. The ordeal
of his approaching trial was one to which he was required
to submit. But it was not essential that his humiliation
should be intensified by his compulsory submission to a
photographic portrayal, for publicity purposes, of his ap-
pearance as he was brought within the precincts of the court
to stand trial for his life. As he was then under the court's
control, it was natural and just that the court should have
a sense of responsibility for his protection against unauthor-
ized invasions of his personal rights. If he had not been
in custody, he might have defended himself against the
photographer's objectionable act. It was entirely justifiable
for the court to intervene under the circumstances, in order
to guard him against the special publicity to which he was

about to be subjected. The liberty of the press does not include the privilege of taking advantage of the incarceration of a person accused of crime to photograph his face and figure against his will. As the Supreme Court of Georgia said in *Pavesich v. New England Life Ins. Co.,* 122 Ga. 190, 217; "The constitutional right to speak and print does not necessarily carry with it the right to reproduce the form and features of an individual."

The interference of the court was with an act which was committed in the court house so near to the time and place of trial that the noise of the photographic flash was audible to the judge, who was about to open the session at which the prisoner was to be arraigned. If the photographer of the Baltimore News was to be permitted to succeed in his effort to obtain Whittemore's picture for publication, a similar privilege could not be fairly denied to photographers of other newspapers. The confusion possibly incident to the general exercise of such a privilege in close proximity to the court, as well as its rightful concern that the prisoner under its control should receive proper treatment, were considerations amply supporting its authority to prevent the consummation of the photographer's design. The purpose of the court could not have been defeated by open defiance, but it was foiled by an artifice which certainly did not make the contempt any less real or reprehensible. One of the grounds mentioned in the Act of 1853, ch. 450 (Code, art. 26, sec. 4), for the exertion of the court's power to punish summarily for contempt, is "the misbehavior of any person or persons in the presence of the said court, or so near thereto as to obstruct the administration of justice." The deceit practiced upon Judge O'Dunne, for the purpose and with the result of obstructing the performance of a legitimate function of his office, was a very flagrant form of misbehavior.

The judicial power to punish for contempt did not emanate from the statute just cited. It is a common law power possessed, independently of statute, by our courts of constitutional origin. As this Court said in *Kelly v. Montebello*

*Park Co.,* 141 Md. 205, quoting from the opinion of Judge Bartol in *Ex parte Maulsby,* reported in 13 Md. 625: "A contempt is an offense at common law; it is not created by the Act of 1853 (Code, art. 26, sec. 4), nor is the jurisdiction to punish it conferred by that act alone. 'It is an offense against the court, as an organ of public justice. The right of punishing for contempts by summary conviction is inherent in all courts of justice and legislative assemblies, and is essential for their protection and existence. It is a branch of the common law adopted and sanctioned by our State Constitution.' *Yates' Case,* 9 John. 417."

The challenge in this case of the court's right to forbid the use of cameras in the court room during the progress of the trial presents an issue of vital importance. If such a right should yield to an asserted privilege of the press, the authority and dignity of the courts would be seriously impaired. It is essential to the integrity and independence of judicial tribunals that they should have the power to enforce their own judgment as to what conduct is incompatible with the proper and orderly course of their procedure. If their discretion should be subordinated to that of a newspaper manager in regard to the use of photographic instruments in the court room, it would be difficult to limit the further reduction to which the authority of the courts would be exposed. It would be utterly inconsistent with the position and prerogatives of the judiciary, as a co-ordinate branch of government, to require its submission to the judgment of a nongovernmental agency as to a question of proper conduct in the judicial forums.

The argument for the appellants concedes that a judge may regulate, as to time, manner, and number, the taking of photographs in the court room, but it is contended that the bounds of his discretion are passed when he substitutes prohibition for regulation. The basic theory of the contention is that representatives of the press have a right to attend and report trials of persons accused of crime, which are public proceedings, and that photographic portrayals of the trial

scenes, if obtained without disturbance, are as legally permissible as verbal descriptions. This theory assumes the right of the persons desiring to procure and publish such pictures to enforce their own views, in opposition to those of the court, as to whether the use of cameras in the court room, to photograph the participants in the trial, during its progress, is consonant with a proper and customary standard of decorum and with the concern and responsibility which the court should feel for the protection of the normal sensibilities of the persons to be affected by such a form of publicity. The constitutional right of the accused to a public trial is a privilege intended for his benefit. It does not entitle the press or the public to take advantage of his involuntary exposure at the bar of justice to employ photographic means of picturing his plight in the toils of the law.

The privilege of the public to attend trials in court is not unrestricted. In *Dutton v. State,* 123 Md. 387, this Court, through Chief Judge Boyd, said: "In determining whether any part of the public should be excluded from the trial of a criminal case, some discretion must be allowed the trial court. Under no circumstances should a trial be so conducted as to have the appearance of a Star Chamber proceeding, but cases sometimes occur which have a demoralizing influence on the spectators and to some extent on the community. * * * The general rule is thus stated in *Cooley's Constitutional Limitations,* side page 312: 'It is also requisite that the trial be *public.* By this is not meant that every person who sees fit shall in all cases be permitted to attend criminal trials; because there are many cases where, from the character of the charge, and the nature of the evidence by which it is to be supported, the motives to attend the trial on the part of portions of the community would be of the worst character, and when a regard to public morals and public decency would require that at least the young be excluded from hearing and witnessing the evidences of human depravity which the trial must necessarily bring to light. The requirement of a public trial is for the benefit of the

accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions; and the requirement is fairly met with, if, without partiality or favoritism, a reasonable proportion of the public is suffered to attend, notwithstanding that those persons whose presence could be of no service to the accused and who would only be drawn thither by a prurient curiosity, are excluded altogether.' "

The ability of a photographer to take a picture in court without noise or distraction, and without the knowledge of the judge, is not a reason why he should be at liberty to ignore a positive judicial order forbidding the use of cameras at the trial. In this instance, the photographer of the Baltimore News was able to obtain the subsequently published views of the trial table group, because he was permitted, through the courtesy of the court, to occupy a seat at a press table conveniently located. He was there ostensibly as a newspaper reporter, and surreptiously took the pictures in question, under instructions from the city editor, after the judge, from whom the special accommodation was accepted, had declared that the taking of pictures at the trial would not be allowed. The photographer's act was clearly none the less a contempt because the judge was not conscious at the time that his order was being disobeyed. It was an order which the court could reasonably pass in the exercise of a sound judgment. It involved no abuse of judicial discretion. There is consequently no occasion to discuss the issue which might arise if such a discretion were to be exercised capriciously and in arbitrary interference with legal rights. The specific question is whether the violation of the order against the use of cameras at the trial was a contempt of court, with which it could deal summarily, and that question we answer in the affirmative.

The privileges of the press under the law deserve the appreciative consideration of the judiciary. There are occasions

when the vindication of those privileges depends upon judicial action. The high importance of the press as an agency of modern civilization is nowhere more freely recognized than in courts of justice. It is declared in our State Constitution that "the liberty of the press ought to be inviolably preserved." *Declaration of Rights,* art. 40. But the duty and disposition of a court to accord a justly ample scope to the liberty of the press should not be carried to the point of an undue abridgment of the court's own freedom. There are proper spheres within which the courts and the press may operate without any conflict of interest or purpose. In this case the liberty of the press has been invoked in support of acts which were an invasion of the domain within which the authority of the courts is exclusive. A due regard for the integrity of the judicial power forbids, and the legitimate interests of the press do not require, that such an encroachment should be sanctioned.

The question whether the judgments appealed from are reviewable is definitely settled by the decision of this Court in *Kelly v. Montebello Park Co., supra,* (141 Md. 194). It was there held that a judgment imposing a fine for criminal contempt is not appealable. The contempt in that case was the violation of an injunction, for which the defendants were ordered to pay stated fines and to be committed to jail until the fines were paid. In the opinion, delivered by Judge Thomas for this Court, it was said: "The first and important question to be determined is whether an appeal lies from such an order. The common law rule was that a court of competent jurisdiction is the sole judge of contempt against its authority and dignity, and its judgment in such cases is final and conclusive, and not reviewable by any other tribunal, either on a writ of error or appeal, unless specifically authorized by statute. *Rapalje on Contempts,* sec. 141; 7 *Am. & Eng. Encyc. of Law,* 33-34; 9 *Cyc.,* 61-62; 13 *C. J.,* pp. 97-98, par. 155; 6 *R. C. L.,* supp. 2, pp. 538-540, sec. 51." After an extended discussion of the distinction between civil and criminal prosecutions for contempt, the former being remedial, for the benefit of parties, while the latter are puni-

tive, to vindicate the court's authority, the contempt then under inquiry was held to belong to the latter class, and the Court further said: "There is no statute in this state expressly providing for appeals in contempt cases, and under the common law rule, the decision of the General Court in *State v. Stone, supra* (3 H. & McH. 115), and the decisions in a number of other states (*People Ex rel. etc. v. Gilmore,* 188 N. J. 626; *Hurley v. Commonwealth,* 188 Mass. 443; *Grand Lodge K. P. of N. J. v. Janson, et al., supra,* 62 N. J. Eq. 737; *Staley v. South Jersey Really Co., supra* (83 N. J. Eq. 300), the order appealed from is not subject to review by this Court." It was said in the opinion that if the right of appeal in cases of criminal contempt were to be determined by reference to the statutory provision for appeals in criminal cases (Code, art. 5, sec. 80), the result would be the same in that case, because the record contained no bills of exception as the statute required. But it had just been definitely ruled that the contempt order was not appealable as there was no statute in force expressly providing for appeals in such cases.

In *Emergency Hospital v. Stevens,* 146 Md. 139, where an appeal from an order of conviction for contempt in the violation of an injunction, reserving the question of punishment, was sought to be dismissed on the ground that the order was not final, the Court, in overruling the motion to dismiss the appeal, said, in the opinion delivered by Judge Offutt, that as no objection had been made by the appellee as to the appealability of the order, the question would not be considered, but that we were "not to be understood as in any way modifying the rule stated in *Kelly v. Montebello Park Co.,* 141 Md. 194, nor as deciding that the appeal would have been entertained over seasonable objection." In view of our prior decisions on the subject, we shall not review the cases in other jurisdictions which were cited by counsel for the appellants in their admirable brief.

As the contempts in the present cases were violations of orders which, in our opinion, were clearly within the legitimate scope of the court's authority, we have not discussed, and do not decide, the question whether a conviction in a con-

tempt proceeding beyond the proper limits of judicial power
would be subject to appellate review.   The issues in these
cases were such as the court below had competent jurisdic-
tion to determine on the evidence, and in the absence of
statutory authorization of the pending appeals, the motion
to dismiss them must be granted.

There is no occasion to pass upon the exceptions in the
record to certain testimony elicited by the trial judge at the
hearing on the contempt charges.   If reviewed they would
not justify a reversal.   The views we have stated in this
opinion cover the subject of the exceptions to the overruling
of motions to quash the citations and dismiss the proceedings.

*Appeals dismissed.*