108 So.2d 33 (1958)
Robert BRUMFIELD, Appellant,
v.
STATE of Florida, Appellee.
Ben SILVER, Appellant,
v.
STATE of Florida, Appellee.
Supreme Court of Florida.
December 10, 1958.
Rehearing Denied January 28, 1959.
Albert B. Bernstein and Bernstein & Hodson, Miami, for appellant Brumfield.
Scott, McCarthy, Preston, Steel & Gilleland, Miami, for appellant Silver.
Richard W. Ervin, Atty. Gen., and Odis M. Henderson, Asst. Atty. Gen., for appellee.
Herbert L. Heiken, Miami Beach, Sinclair & Nicholson, Howard W. Dixon, Park H. Campbell, John E. Kirk, Melbourne L. Martin, Walter Humkey and Thomas McE. Johnston, Miami, amici curiae.
DREW, Justice.
The appellants in these causes, consolidated for treatment in this opinion, have been adjudged in contempt of court for willful violation of an order of the Circuit Court for Dade County prohibiting the photographing of a certain prisoner "in the jail preceding his arraignment, or on his way to or from the court session * * * or in the courtroom.[1]
The prisoner, Howard B. Picott, had been indicted for rape. Prior to the quoted order, *34 he was the subject of extensive local publicity concerning his arrest and past criminal record. The appellant Silver, with knowledge of the order, obtained motion pictures of the prisoner on the 19th floor of the Dade County Courthouse as he was brought from the elevator leading to the detention quarters above. The other appellant, Brumfield, stationed himself a short distance from the entrance to the courtroom in which the arraignment proceedings were to be held[2] and there, in his capacity as television photographer, took certain photographs of Picott. Appellants (and others not here involved) were immediately cited for contempt. The films were not actually used or broadcast.
At the hearing below and upon this appeal appellants attack the validity of the original order of the court. Specifically they raise questions of freedom of the press under the First and Fourteenth Amendments of the Constitution of the United States and under Sections 1 and 13 of the Declaration of Rights of the Constitution of Florida, F.S.A. Their major contention appears to be that the court's injunctive power in this connection should be restricted to the prevention of acts or conduct which constitute physical disturbances of courtroom decorum. Rule 35[3] of the Florida Code of Ethics, 31 F.S.A., governing judges is cited as embodying such a limited proscription.[4]
While the record evidence is probably adequate to demonstrate that the photographic techniques used by appellants were not such as to cause inordinate disturbance *35 or indignities by distracting lights or sound, the point is not determinative of the issue at hand. Nor is the fact that the contested order was quite ineffective to curtail photographic publicity generally since pictures of the prisoner had already been widely published in the vicinity by both the newspaper and television medium.[5]
The order, in fact, was not on its face directed against publication of any matter or material whatsoever. The only "freedom" restrained is one shared by press and public alike: an alleged right of full and complete access to participants in events of public interest or newsworthiness. A recent federal court decision, dealing with the same asserted privilege of photographing parties to judicial proceedings beyond the court confines, recognizes this clear distinction: "Realizing that we are not dealing with freedom of expression at all but with rules having to do with gaining access to information on matters of public interest, can it be argued that here there is some constitutional right for everybody not to be interfered with in finding out things about [or making photographic reproductions of] everybody else?"[6]
Appellants in this case propose no theory, nor are we conscious of any, upon which the right to gather news, by photographic or other processes, can be extended to proceedings other than those public in character, however newsworthy the events might be. They rely, first, upon the public character of judicial proceedings under constitutional provisions securing public trials, and, second, upon the lack of any protectable right of privacy personal to the prisoner.
On the first point we are referred to numerous decisions dealing with permissible public comment on judicial proceedings, and the limits of a court's power to place prior restraints on publication or to penalize press comment as a contempt, even in the absence of prior court order, as an obstruction of justice:
"A trial is a public event. What transpires in the courtroom is public property. * * * Those who can see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire proceedings before it."[7]
Those cases construe applicable constitutional inhibitions to impose the "clear and *36 present danger" test as a condition or limitation of a court's power to restrain or penalize free comment, in contrast to the usual rule by which a court, pursuant to its duty to maintain an orderly system of justice and to conduct all proceedings in a manner which accords due process of law to the parties before it, may restrain or penalize conduct reasonably calculated to obstruct those ends.
When the conduct restrained involves the exercise of a constitutionally protected right or freedom, as of speech, press, or religion, then a different test may reasonably be applied or a more stringent necessity required before such restraint or control is warranted. But it does not follow that a court is governed by the same rules in restricting access to its own proceedings (or penalizing a direct violation of such restrictions) as in restraining or penalizing independent conduct of third parties. The safeguard against an abusive judicial "censorship" of its proceedings by such means is the same as that which controls all judicial action in this direction: the requirement that such measures must appear to be necessary to a fair trial.[8]
There has not been shown to exist any compulsion upon a court or any other governmental agency to make available for public consumption all aspects of each step of every proceeding conducted under its authority. In the case of the judiciary, historical experience, culminating in our constitutional guarantees, showed only the necessity for "public trial." This requirement, even if it should be deemed to include the preliminary steps involved in the situation at bar and even if a ban on photography by public and press alike is considered to be a restriction on the public nature of the proceedings,[9] has always been subject to limitation. Conceding the force of the argument that the rationale which gave birth to this principle is concerned with the public interest as well as with the rights of the accused,[10] its purpose in either event is "that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility, and to the importance of their functions."[11] The conclusion of the author of the quoted text, supported by numerous decisions, is that "the requirement is fairly observed if, without partiality or favoritism, a reasonable proportion of the public is suffered to attend." Thus it is a generally recognized rule that a criminal trial judge may exclude all or any portion of the public from a trial, depending upon the necessities of the situation, in order to prevent disorders and disturbances of any nature which would interfere with the orderly course of the proceedings.[12] Nor, presumably, is it error to refuse to news gathering forces the right to obtain or release the name of a rape prosecutrix, or to keep certain portions of judicial records confidential.[13] The purpose of such restrictions is manifestly not confined to prevention of physical disturbance, and the power to limit public information or exclude spectators would certainly include the power to limit the vicarious audience by prohibiting photography.
None of the cited cases is authority for the proposition, nor does our search reveal *37 one which holds, that the "clear and present danger" rule governs a court's power to restrict, upon occasion, the public character of judicial proceedings or to regulate or place certain limitations on public access to persons in custody. The requirement has been simply that such limitations must appear to be reasonably required for the orderly administration of justice.[14] The duty of the court in this respect is not confined to preserving order or decorum in the courtroom itself, as appellants appear to believe and as might be inferred from the language of Canon 35, supra, but obviously relates to the entire process from the inception, in the case of criminal proceedings, of official custody of the accused.[15]
It is generally conceded that under certain circumstances the public and press alike might be denied permission to interview or otherwise make personal contact with a prisoner awaiting trial. Certainly he might be brought to the courtroom, for arraignment, by a route other than the public corridor if physical facilities were available. If constitutional inhibitions do not prevent that procedure, can they operate to prevent a court's accomplishing the same end by injunctive order if circumstances dictate such precautions? We think not.
Concluding, as we do, that the case at bar does not involve a prior restraint on free expression or reporting, but simply a restraint on public trial by which portions of the proceedings assume the aspects of a private event in connection with which attendance and conduct could reasonably be restricted or controlled, then the record before us is ample to sustain a finding of proper relationship between the order of the court and its duty to maintain order and decorum and accord due process to parties before it in a case attended by such notoriety and emotional distress, demonstrated by the volume of attention by the press and television representatives even in the face of the restraining order.
That such extensive publicity can adversely affect the rights of a defendant to a fair trial is no longer debatable. In reversing a conviction resulting from a trial accompanied by press activity in its wildest form, involving the same charge as in the case at bar, a United States Supreme Court Justice concluded that "prejudicial influences outside the courtroom, becoming all too typical of a highly publicized trial, were brought to bear on this jury with such force that the conclusion is inescapable that these defendants were prejudged as guilty and the trial was but a legal gesture to register a verdict already dictated by the press and the public opinion which is generated."[16] And while it is true that the court did not, by the order controverted here, place any generally effective limitations on pretrial publicity (if, indeed, it can ever do so under existing law), the admonitions against unnecessary sensationalism in pretrial publicity are peculiarly applicable to the instant case, where the court faced the necessity of impaneling an impartial jury, where there appeared to be no real justification for mass viewing of the events in question, and photographic records would serve only to increase the already large volume of publicity concerning the case. As noted in the above cited opinion, recent decisions dealing with actual restraints on free comment have "gone a long way to disable a trial judge from dealing with press interference with the trial process," but this fact does not alter the duty of the court, by whatever limited measures available, particularly in exercising control over its own processes as opposed to external conduct, to do everything possible to curtail direct interference *38 with pretrial processes involving conduct not vital to full public information.[17]
Since the order must be sustained on the foregoing ground, it is not necessary to determine whether the court's efforts to prevent photographic exploitation of the case or the prisoner's person could lawfully have been grounded upon the preservation of his personal right of privacy. Substantial, and, we think, the best, authority supports such a measure, on the theory that a "public figure" relinquishes privacy only to the extent necessary to satisfy legitimate public interest in the public event or events in which he may be involved.[18] It is difficult to see, in the instant case, any necessity or reason for gratification of a desire to witness the accused's visage at this point in the proceedings against him, and because of the essentially helpless position of one in legal detention, judicial restraint of possible tortious conduct against him would logically be warranted in spite of the general rule against injunctive relief to prevent commission of a tort.[19]
There is little justification for a running fight between the courts and the press on this question of a fair trial and a free press. Both are basic and sacred concepts in our system of government. Both are in one Constitution and govern one nation of millions of individuals. All that is required to preserve both is for the press and the courts to place the emphasis on the Constitution instead of themselves.
Affirmed.
TERRELL, C.J., and HOBSON, THORNAL and O'CONNELL, JJ., concur.
NOTES
[1] The text of the order was as follows:

"The defendant is to be arraigned before me in open court today at noon in the courtroom in which I shall then be presiding.
"The experiences of a fellow judge in another case impel me to enter this order, in the exercise of the court's inherent power, for the purpose of insuring that the proceedings before me in this case shall be conducted in an atmosphere of dignity and decorum and with due regard for the rights and privileges of the accused.
"It is ordered that no photographs or pictures shall be taken during the proceedings before me in this case in the courtroom or at any place within thirty feet of any entrance to the courtroom; and that the accused shall not be photographed in the jail preceding his arraignment, or on his way to or from the court session during which he is to be arraigned, or in the courtroom. The accused has specifically objected to being so photographed.
"I have no wish to engage in controversy with photographers or cameramen who desire to procure for publication in the press or by television, photographs or pictures taken in, or in the vicinity of, the courtroom, but I do not intend that my judicial discretion shall be subordinated to their understandable desires. A violation by any photographer or cameraman who shall have notice of this order or any of its provisions shall, therefore, be deemed and treated as contempt of this court; and, should any prohibited photograph or picture be taken by any photographer or cameraman before he shall have notice of this order, he shall, on being advised of it, immediately surrender the photograph or picture to the clerk of this court and such photograph or picture shall not be published in the press or by television.
"The Sheriff of Dade County, Florida, and his deputies (including the court bailiff), are authorized and required to enforce and effectuate this order, but in doing so shall not employ any force or violence and shall not destroy or damage any camera or photographic equipment. Any person or persons who shall violate any provision of this order shall, however be brought immediately before me in open court for appropriate judicial action.
"The Sheriff and his deputies (including the bailiff) shall give notice, in the most practical manner, to all photographers and cameramen who shall be found in or near the courtroom in which the defendant is to be arraigned.
"Ordered in open court in the Courthouse of Dade County, Florida, at Miami, November 7, 1957, * * *."
[2] Access to the courtroom was through a small entry or bailiff's hall leading from the main antechamber onto which the elevators, as well as two other courtrooms, opened.
[3] "Improper publicizing of court proceeding.  Proceedings in court should be conducted with fitting dignity and decorum. The taking of photographs in the court room, during sessions of the court or recesses between sessions, and the broadcasting of court proceedings are calculated to detract from the essential dignity of the proceedings, degrade the court and create misconceptions with respect thereto in the mind of the public and should not be permitted." Florida Statutes 1957, Vol. 3, p. 3214.
[4] For a complete history of Canon 35 see "Report and Recommendations on a Restatement of Canon 35 of the Canons of Judicial Ethics," published 1957, The American Bar Foundation, American Bar Center, Chicago, Illinois; and "Judicial Canon 35  Conduct of Court Proceedings," published May 1, 1958, in pamphlet form by the American Bar Association, containing proceedings of the House of Delegates of the February 1958 meeting, and report and recommendations with respect to revision of Canon 35 to read as follows:

"Conduct of Court Proceedings
"The purpose of judicial proceedings is to ascertain the truth. Such proceedings should be conducted with fitting dignity and decorum, in a manner conducive to undisturbed deliberation, indicative of their importance to the people and to the litigants, and in an atmosphere that bespeaks the responsibilities of those who are charged with the administration of justice. The taking of photographs in the courtroom during the progress of judicial proceedings or during any recess thereof and the transmitting or sound-recording of such proceedings for broadcasting by radio or television introduce extraneous influences which tend to have a detrimental psychological effect on the participants and to divert them from the proper objectives of the trial; they should not be permitted."
The meeting of the House of Delegates at the Los Angeles Convention in August 1958 further considered this revision but again postponed final action. Nov. '58, Vol. 44, A.B.J. 1063.
[5] The record reflects that more than 160,000 people in the greater Miami area view television. The Miami Herald, representative of the newspaper media in which defendant's photograph appeared, has a circulation in the same area of 250,000, more or less.
[6] Tribune Review Publishing Co. v. Thomas, 3 Cir., 254 F.2d 883, 885. Accord: United Press Ass'n v. Valente, 308 N.Y. 71, 123 N.E.2d 777.
[7] Craig v. Harney, 331 U.S. 367, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546. See also Pennekamp v. State of Florida, 328 U.S. 331, 347, 369, 66 S.Ct. 1029, 1037, 1048, 90 L.Ed. 1295.
[8] 14 Am.Jur. 864-868.
[9] For the general proposition that freedom of press includes photographic media see Lovell v. City of Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260.
[10] People v. Jelke, 308 N.Y. 56, 123 N.E.2d 769, 48 A.L.R.2d 1425; In re Oliver, 333 U.S. 257, 266, 68 S.Ct. 499, 92 L.Ed. 682.
[11] Cooley's Constitutional Limitations, 8th Ed., Vol. 1, page 647.
[12] Robertson v. State, 64 Fla. 437, 60 So. 118, Annotation 156 A.L.R. 281, 284; 48 A.L.R.2d 1448, 1449.
[13] See F.S. Sections 794.03, 801.14-.15, F.S.A.
[14] Note 12, supra. And for a ruling in point on facts very similar to those here involved, see Ex parte Sturm, 152 Md. 114, 136 A. 312, 51 A.L.R. 356.
[15] Cf. Ex parte Savin, 131 U.S. 267, 9 S.Ct. 699, 33 L.Ed. 150; Dangel "Contempt," section 199.
[16] Shepherd v. State of Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740.
[17] See "Fair Trial and Free Press," A.B.A. Journal, Vol. 43, No. 12, pages 1108-1110, in re People v. Sampedro (P.R.).
[18] In re Mack, 386 Pa. 251, 126 A.2d 679; Ex parte Sturm, supra. "A public character does relinquish a part of his right of privacy. * * * But such a waiver is limited to that which may be legitimately necessary and proper for public information." Birmingham Broadcasting Co. v. Bell, 259 Ala. 656, 68 So.2d 314, 319. See also note, N.Y.U. Intramural Law Review, Vol. 10, No. 3, p. 185-197, revisiting Warren and Brandeis, "Right to Privacy", 4 Harv.L.Rev. 193 (1890).
[19] In re Mack, supra.