20851.   ATLANTA NEWSPAPERS, INC., *et al. v.* GRIMES, Sheriff, *et al.*

SUBMITTED APRIL 12, 1960—DECIDED MAY 5, 1960—
REHEARING DENIED MAY 18, 1960.

*B. P. Gambrell, John E. Dougherty, Stephens, Fortson, Bentley & Griffin,* for plaintiffs in error.

*Harold Sheats, Griffin Patrick, Jr.,* contra.

HAWKINS, Justice, after stating the foregoing facts.
Many questions are dealt with in the opinion and judgment of the trial judge, consisting of 125 pages, and in the brief of counsel for the plaintiffs in error, consisting of 142 pages, which are not directly involved in the present case, such as the redress of libel, the power of the courts to punish for contempt, and the individual's right of privacy.

That the courts of this State have consistently sought to uphold and enforce the constitutional provisions relied upon by the plaintiffs in error, is conclusively established, we think, by the decisions in the following cases: *McGill* v. *State of Georgia,* 209 *Ga.* 500 (74 S. E. 2d 78) ; *Waters* v. *Fleetwood,* 212 *Ga.* 161 (91 S. E. 2d 344) ; *Ledger-Enquirer Co.* v. *Brown,* 213 *Ga.* 538 (100 S. E. 2d 166) ; *Townsend* v. *State of Georgia,* 54

*Ga. App.* 627 (188 S. E. 560); *Ledger-Enquirer Co.* v. *Brown,* 214 *Ga.* 422 (105 S. E. 2d 229). We heartily subscribe to the statement in some of the decisions to the effect that the function of publicity in the form of newspaper reporting and comment as "an effective restraint on possible abuse of judicial power," is one of the fundamental safeguards of a free society. New York Post Corporation *v.* Leibowitz, 2 N. Y. 2d 677, 682 (143 N. E. 2d 256); In Re Oliver, 333 U. S. 257, 270 (68 S. Ct. 499, 92 L. Ed. 682); Times-Picayune Publishing Co. *v.* United States, 345 U. S. 594 (73 S. Ct. 872, 97 L. Ed. 1277); Pennekamp *v.* Florida, 328 U. S. 331 (66 S. Ct. 1029, 90 L. Ed. 1295).

We also recognize that freedom of the press means freedom to gather news, write, publish, and circulate it, and that gathering news embraces photographing the news, printing the photographs, and reproducing the photographs in the finished newspapers; and as was held in Ex Parte Sturm, 152 Md. 114, 123 (136 A. 312, 51 A.L.R. 356), "The privileges of the press under the law deserve the appreciative consideration of the judiciary. There are occasions when the vindication of those privileges depends upon judicial action. The high importance of the press as an agency of modern civilization is nowhere more freely recognized than in the courts of justice."

But we also call attention to what Mr. Chief Justice Duckworth, speaking for this court, said in *McGill* v. *State of Georgia,* 209 *Ga.* 500, 502, supra, that "In large measure the fate of individual freedom depends upon the maintenance of a free and independent press and independent courts with full power to compel obedience to court orders. These two in our system of popular government are given the high and noble mission of preserving freedom. Since the functions of the one complement the work of the other in the attainment of this common objective, it would be regrettable if at any time a claim of excessive power by either as relates to the other should be allowed to create a conflict between them. If either could destroy the other, it would thereby pull down upon its own head a fortress dedicated to the protection of the freedom not only of the individual citizen but that of the destroyer also. The present case requires a decision marking the dividing line between the respective powers and rights of both."

In Brumfield *v.* State of Florida, 108 So. 2d 33, 38, it is said:
"There is little justification for a running fight between the
courts and the press on this question of a fair trial and a free
press. Both are basic and sacred concepts in our system of
government. Both are in one Constitution and govern one na-
tion of millions of individuals. All that is required to preserve
both is for the press and the courts to place the emphasis on
the Constitution instead of themselves."

Our Code § 24-104 provides: "Every court has power (1) To
preserve and enforce order in its immediate presence, and as
near thereto as is necessary to prevent interruption, disturbance,
or hindrance to its proceedings. . . (4) To control, in fur-
therance of justice, the conduct of its officers and all other per-
sons connected with a judicial proceeding before it, in every
matter appertaining thereto." In Carr *v.* State, 76 *Ga.* 592, 593,
(2c), this court held: "Discretion in regulating and controlling
the business of the court is necessarily confided to the judge;
and this court should never interfere with its exercise unless it
is made to appear that wrong or oppression has resulted from
its abuse." In *Perryman* v. *State,* 114 *Ga.* 545, 546 (40 S. E.
746), this court said: "It is a well-recognized principle of our
law that the judges of superior and city courts are invested with
a wide discretion in the management of the business before them,
and this discretion will not be controlled unless it is shown to
have been manifestly abused." See also, in this connection,
*Pearce* v. *State,* 79 *Ga.* 437 (4 S. E. 849); *Myers* v. *State,* 97
*Ga.* 76, 98 (5) (25 S. E. 252).

In the matter of In Re Hearings Concerning Canon 35 of the
Canons of Judicial Ethics, 132 Colo. 591, 593 (296 P. 2d 465,
467), it is said: " 'No freedoms are absolute.' The freedoms
of speech and press are not exceptions." Courts have the power
"to determine the manner in which they shall operate in order to
administer justice with dignity and decorum, and in such manner
as shall be conducive to fair and impartial trials and the ascer-
tainment of truth uninfluenced by extraneous matters or dis-
tractions. If at any time the representatives of the 'press' in
any field of activity interfere with the orderly conduct of court
procedure, or create distractions interfering therewith, the

court has the inherent power to put an immediate stop to such conduct." In *McGill* v. *State of Georgia*, 209 Ga. 500, 503, supra, this court held that "liberty of the press is subordinate to the independence of the judiciary and the proper administration of justice." In Ex Parte Sturm, 152 Md. 114, 121, supra, it is said: "It is essential to the integrity and independence of judicial tribunals that they shall have the power to enforce their own judgment as to what conduct is incompatible with the proper and orderly course of their procedure," and to enforce rules so long as they bear a reasonable relationship to the aim sought: maintenance of the dignity of the court and the orderly administration of justice. This language in the Sturm case was quoted with approval in the more recent case In Re Mack, 386 Pa. 251, 258 (126 A. 2d 679), and in the Mack case it was held that the court could anticipate the taking of pictures and prohibit it beforehand. It is insisted by counsel for the plaintiffs in error that the rulings there made are not applicable here because the courts were there dealing with the question of taking pictures in the courtroom, while here the order complained of extends beyond the courtroom and to the sidewalks and streets adjacent to the courthouse. In Tribune Review Publishing Co. *v.* Thomas (3d Cir.), 254 F. 2d 883, 885, cited with approval by the Supreme Court of Florida in the Brumfield case, supra, it is said: "If a judge may, for the purpose of maintaining order and decorum, control the taking of pictures in his own courtroom it can hardly be successfully argued that his power stops when one closes the courtroom door."

■ It appears from the record in this case that the order here complained of was entered on November 3, 1958, under the following circumstances: On October 12, 1958, a house of worship in Fulton County, known as "The Temple" was damaged by an explosion, and it was charged that the house of worship had been bombed. The occurrence was widely publicized. Five named persons were lodged in jail charged with the crime, and on October 14, 1958, they obtained issuance of the writ of habeas corpus, which was set to be heard on October 17, 1958. At about two or three o'clock on the afternoon of October 16, 1958, from the courthouse steps on Pryor Street, two counsel for these five

men addressed a crowd gathered on the sidewalk and street, which addresses were recorded for radio and television; and collected on the sidewalk and on Pryor Street with the crowd were mobile units of television services, the cameras and equipment of the representatives of newspapers, radio and press services, and a large amount of photographic equipment of other individuals. On the morning of the 17th of October the grand jury indicted four of those previously arrested and another for a capital offense growing out of the alleged bombing of "The Temple," and the habeas corpus hearing was held at 2 o'clock. The applicants for habeas corpus were brought from the jail to the courthouse by the sheriff's prison bus, which was parked on Pryor Street just south of the front steps of the courthouse, so that the five men, shackled to a chain, could be carried to the prisoners' elevator. As they were taken out of the bus, and thus shackled, they were photographed. Before the habeas corpus hearing the corridors outside the courtroom were crowded with people, including some twenty or twenty-five photographers representing commercial newspapers, radio and television interests. Recording devices, flash cameras, and sound-recording equipment were located in the corridors. Pictures of the prisoners were taken in the corridors, and numerous pictures were made in the courtroom before the trial. Four of the prisoners were photographed shackled to their chain as they were taken back to the jail after the hearing. Following the habeas corpus hearing, the same counsel again addressed the crowd from the courthouse steps, and this was recorded and carried on television and radio. On the occasion of one of these addresses 50 or 60 representatives of newspapers, television, radio, magazine and wire services and two to three hundred other people congregated on Pryor Street during the taking of pictures and completely blocked traffic on Pryor Street.

In addition to the wide publicity given to this case, there were under investigation before the grand jury charges against various public officials and employees of the State of Georgia, wherein they were accused of misappropriating public funds and other offenses, which were also given wide publicity, including an indictment against the then Revenue Commissioner of the State,

wherein he was charged with misappropriation of public funds, which cases were assigned for trial during the November term, 1958, of that division of Fulton Superior Court, over which the judge who entered the order was to preside.

It is stipulated that there are 200 weekly newspapers, 31 daily newspapers in the State, 3 commercial and 1 educational television station, and 13 radio stations in the City of Atlanta; and in the State, including Atlanta, there are 13 television stations, 112 radio stations, 2 national news services, and numerous news agencies.

The record discloses that the courtrooms in the Fulton County Courthouse begin on the second floor and extend to the sixth floor; that the courthouse is bounded on the north by Hunter Street, south by Mitchell Street, east by Central Avenue, and west by Pryor Street, and the distances from the sidewalks to the walls of the courthouse on the different sides of the courthouse square vary from 10 feet and 4 inches to 180 feet.

When the foregoing facts are considered in the light of the rules of law above announced, we think that the language used by the Supreme Court of Maryland in the Sturm case, supra, is peculiarly applicable here, and we, too, hold that the duty and disposition of a court to accord a justly ample scope to the liberty of the press should not be carried to the point of an undue abridgment of the court's own freedom. There are proper spheres within which the courts and the press may operate without any conflict of interest or purpose. In this case the liberty of the press has been invoked in support of acts which the trial judge found were an invasion of the domain within which the authority of the court is exclusive. A due regard for the integrity of the judicial power forbids, and the legitimate interests of the press do not require, that such an encroachment should be sanctioned. Paragraph 5 of the order here involved specifically provides: "Each of these provisions will be liberally construed and in the interest of orderly proceedings and impartial trials; and shall in no wise prevent the press or public from taking shorthand or longhand accounts of all proceedings, but, if necessary the number of persons so engaged will be regulated." We cannot hold that, under these facts, the trial judge has abused the

discretion vested in him by law, or that the order complained of is invalid or erroneous for any reason assigned.

*Judgment affirmed.   All the Justices concur.*